## Case No. 15,941.

### UNITED STATES v. ONE HUNDRED AND TWENTY-NINE PACKAGES.

[2 Am. Law Reg. (N. S.) 419.]

District Court, E. D. Missouri. Sept., 1862.

FORFEITURE—INTERCOURSE WITH INSURRECTIONARY STATES—INTERDICT—STATUS OF TERRITORY —HOW DETERMINED.

1. The act of congress of July 13, 1861 [12 Stat. 255], is not a penal but a revenue statute, and is to be construed liberally, so as to accomplish its proposed object.

2. Where a party for fraudulent purposes mixes up goods prohibited by a revenue act with those not prohibited, the whole will be forfeited.

3. A citizen may be forbidden by a municipal law to do what would be lawful for a neutral to do on the high seas.

4. A sale of contraband property to a belligerent in a neutral territory is a violation of neutrality, and, à fortiori, such sale in one belligerent country by a citizen or domiciled person thereof, is a breach of allegiance.

5. Hence the act of July 13, 1861, prohibits every act done towards the execution of a design to carry on, without a "permit," commercial intercourse between the interdicted and other states, and it is violated not only when a vessel has actually sailed with the goods on board, but the moment the goods are started, even on land, towards the forbidden destination. The application for a "permit" is evidence of the intention to proceed, and the use of fraudulent invoices to procure the "permit," shows the intention to be fraudulent. The shipment of goods under color of that permit, is a step taken in execution of that fraudulent intent—is an overt act. Such goods are "proceeding to" the interdicted port within the meaning of the act of July 13, 1861, and the shipper, under the act of May 20, 1862 [12 Stat. 404], is guilty of an "attempt" to transport them in violation of law.

6. The condition of peace or war, public or civil, in a legal sense, must be determined by the political department of the government, and the courts are bound by that decision.

[Cited in Perkins v. Rogers, 35 Ind. 155.]

7. By the act of July 13, 1861, the prohibition of commercial intercourse is to be in force "so long as such condition of hostility shall continue." The same power which determines the existence of war or insurrection, must also decide when "the condition of hostility" ceases. In a legal sense the state of war or peace is not a question in pais for courts to determine. It is a legal fact ascertainable only from the decision of the political department.

8. Hence, when the president has proclaimed a state to be in insurrection, the courts must hold that this condition continues until he decides to the contrary.

9. The same rules apply as to the exceptions from the interdict, of such parts of the insurrectionary states "as may maintain a loyal adhesion to the Union and the constitution, or may be from time to time occupied and controlled by forces of the United States engaged in the dispersion of said insurgents." Such exceptions, and the legal status of such parts of the said states, are to be determined by the president.

Libel of information under the act of congress, July 13, 1861 [against one hundred and twenty-nine packages, W. H. Probasco, claimant].

W. W. Edwards and C. S. Hayden, for the United States.

J. K. Knight, for claimant.

TREAT, District Judge. The facts submitted in this case are substantially these: The claimant, proposing to make a shipment of merchandise to Memphis in the state of Tennessee, applied to the surveyor of the port of St. Louis for a permit, under the regulations of the secretary of the treasury, pursuant to the act of July 13, 1861 [12 Stat. 255]. He represented that the proposed shipment contained, among other things, 100 barrels of cement. A "permit" having been granted for the specified goods, the claimant sent on board of a steamer, bound for Memphis, said 100 barrels and the 129 packages now in litigation. The surveyor caused said shipment to be examined after it was on board of said steamer, and whilst she still lay at the wharf here, and detected, that instead of 100 barrels of cement, there were 100 barrels of whiskey

packed in cement for the purpose of concealing the same. Thereupon the whole shipment was seized.

The agreement of the facts, as filed, states that Memphis, the port of destination, is not now "in a condition of hostilities" against the United States, and that it is "occupied and controlled by forces of the United States, engaged in the dispersion of the insurgents." The claimant does not interpose a claim for the 100 barrels of cement and the whiskey packed therein, but solely for the 129 packages which contain no prohibited goods.

The first proposition urged by his proctor is that the statute of July 13, 1861, is a penal statute, in derogation of common right, and consequently it is to be strictly construed. Common right, it must be observed, requires the bonds of society to be preserved so as to prevent anarchy, and the consequent destruction of all safeguards for persons and property. Every member of society is directly interested in its preservation. Governments are instituted for the common good; and when a blow is aimed thereat, every citizen's rights are assailed. Measures adopted for the common safety are therefore, generally construed liberally, or so as to effect the proposed object. The theory upon which that rule depends was fully considered in this court in the cases of U. S. v. The Hannibal [Case No. 15,298]; Same v. Champion [Id. 14,779], decided at the November term, 1861. The statute of July 13, 1861, being a revenue statute, is to be construed according to the rules governing such acts, and not as a mere penal enactment. In the case of Taylor v. U. S. 3 How, [44 U. S.] 210, the supreme court of the United States held: "In one sense every law imposing a penalty or forfeiture may be deemed a penal law; in another sense such laws are often deemed, and truly deserve to be called, remedial. The judge was, therefore, strictly accurate when he stated (in the court below) that 'it must not be understood that every law which imposes a penalty is therefore, legally speaking, a penal law— that is, a law which is to be construed with great strictness in favor of the defendant. Laws enacted for the prevention of fraud, for the suppression of a public wrong, or to effect a public good, are not in the strict sense penal acts, although they may inflict a penalty for violating them.' And he added: 'It is in this light I view the revenue laws, and I would construe them so as most effectually to accomplish the intention of the legislature in passing them.' The same distinction will be found recognized in the elementary writers; as, for example, in Blackstone's Commentaries (1 Bl. Comm. 88); Bac. Abr. 'Statutes' 1, 7, 8; Com. Dig. 'Parliament' R. 13, 19, 20; and it is also abundantly supported by authorities." Similar decisions may be found in The Harmony [Case No. 6,081]; [Sundry Goods v. U. S.] 2 Pet. [27 U. S.] 358; [Wilkinson v. Leland]

Id. 627; [Wood v. U. S.] 16 Pet. [41 U. S.] 342. The justice of that rule was, in the cases referred to as decided November term, 1861, fully discussed by this court in the light of right reason, of the nature, objects, and necessity of social and governmental organization, and also of the essential elements of individual safety and happiness. Surely such statutes, adopted for the existence of government against armed efforts for its overthrow, upon the faithful observance of which the peace of society depends, should receive such a construction as will according to their scope and object effect the public end designed. Hence, in the interpretation of the act of July 13, 1861, courts are bound to give to it no such narrow and technical construction as may defeat its salutary purposes. Allegiance is a primary tie, and treason the greatest of crimes; for inasmuch as allegiance is the bond by which society exists, so the breach of that allegiance by direct overt acts, is an attempt to dissolve social and governmental organization, reducing society to chaos—a condition in which moral, as well as political, obligations give way to physical force and blind passion. The right of each and all, or "common right," is not assailed when constitutional and remedial measures are adopted for the common good. The history of the existing Rebellion fully illustrates the doctrine. The untold calamities it has devolved upon all citizens of the republic, are too keenly felt to need exposition.

But whatever rule of interpretation is adopted in this case, the same result will follow. The claimant admits that he undertook a fraud upon the law. If the act of July 13, 1861, was either an ordinary revenue act, or a simple penal act, he would still fall within its provisions. He chose for fraudulent purposes to mix up with unprohibited goods, those directly prohibited. He knew that the vast interests at stake, civil and military, would admit of no relaxation of the interdict against intercourse under the act of congress and the president's proclamation, so far at least as the shipping of whiskey to the insurrectionary states, and to our camps there, was concerned; yet for his individual gain he was willing, not only to jeopardize those public interests, but to do so by a resort to falsehood and fraud. There can be no pretence that he was actuated by any higher motive than a sordid lust of gain, which ignored all considerations of law or justice. He knew that he was violating the law; and he attempted to defraud the government, not in the matter of dollars and cents alone. Still he appears before the court with the strange request, to have it unravel for him the tangled skein of fraud which he has deliberately woven, and then restore to his possession such parts as would have been untainted if he had not wound them into one promiscuous mass. No principle known to law or equity tolerates such

a procedure. He has mixed up the good with the bad, and the mass must be treated as he has voluntarily made it. Neither at common law, nor in equity, would a court aid in such unclean work. In international law, as illustrated in prize cases, the owner of a contraband cargo never receives restitution of any portion of it, when thus tainted with fraud against the belligerent. It is a universal maxim, in every department of jurisprudence, "ex turpi causa, aut ex dolo malo, aut ex maleficio, non oritur actio;" and in admiralty every claimant is an actor. If he cannot establish his claim, except through fraud, he is left in the position he assumed. [La Nereyda] 8 Wheat. [21 U. S.] 147; [The Venus] 8 Cranch [12 U. S.] 276, [The Sally] Id. 382; [U. S. v. One Thousand Nine Hundred and Sixty Bags of Coffee] Id. 398; [The Bello Corrunes] 6 Wheat. [19 U. S.] 169; [U. S. v. Four Hundred and Twenty Two Casks of Wine] 1 Pet. [26 U. S.] 547; [The Palmyra] 12 Wheat. [25 U. S.] 1; [U. S. v. Three Hundred and Fifty Chests of Tea] Id. 486; [Murray v. The Charming Betsy] 2 Cranch [6 U. S.] 72; 3 Phil. Ins. § 276; 1 Duer, Ins. 594, 625; 6 C. Rob. Adm. 125; 1 C. Rob. Adm. 238, 329; 16 East, 13; 3 C. Rob. Adm. 178, 221, 295; 2 C. Rob. Adm. 6; 4 C. Rob. Adm. 68. The intermixture of fraudulent goods with those not prohibited may, or may not, in some cases be designed to conceal the fraudulent from detection; but the law pronounces the whole mass tainted. The purpose, however, in this case, is transparent. The design was fraudulent, and the act fraudulent. The whole shipment was one transaction. If the goods had not been included in one "permit," yet, if they were shipped by the same owner, on the same voyage, and in the same vessel, they would have shared the same fate. By the law of prize the concealment of spoliation of papers, or defective papers, call for explanation from the claimant. An assertion of a false claim, in whole or part, is a substantive cause of condemnation. A vehement presumption of bad faith, or gross prevarication or fraud, or gross misconduct, or illegality, will cause forfeiture. A party must act in entire good faith, or restitution is not awarded. The rule extends so far, that if a shipowner lends his name to cover a fraud with respect to cargo, that circumstance alone will subject the vessel to condemnation. The fraud taints all it touches. The Pizarro, 2 Wheat. [15 U. S.] 241; The Fortuna, 3 Wheat. [16 U. S.] 236; The Venus, 5 Wheat. [18 U. S.] 127; The London Packet, Id. 132; The Amiable Isabella, 6 Wheat. [19 U. S.] 1; The Dos Hermanos, Id. 76.

But as the vessel had not left port, or started on the voyage, it is contended that here has been no violation of the statute; language of which is "all goods and wares and merchandise, &c., proceeding to such state or section, by land or water, * * * shall be forfeited." Were the goods in question "proceeding to" the interdicted section, within the meaning of the act? It is a well-established rule, that sailing with an intention to evade a blockade is a beginning to execute that intention, and an overt act constituting the offence. From that moment the blockade is fraudulently invaded. The Columbia, 1 C. Rob. Adm. 156; The Frederick Molke, 1 C. Rob. Adm. 86; The Hoffnung, 6 C. Rob. Adm. 112, 117; The Vrow Johanna, 2 C. Rob. Adm. 109; The Abby, 5 C. Rob. Adm. 256; Fitzsimmons v. Newport Ins. Co., 4 Cranch [8 U. S.] 199; Yeaten v. Fry, 5 Cranch [9 U. S.] 343; The Nereide, 9 Cranch [13 U. S.] 440, 446; The Rugen, 1 Wheat. [14 U. S.] 62. A concealed illegal destination is proof of a real intention to break a blockade. The James Cook, Edw. Adm. 261. So a sale in a neutral country of contraband articles to a belligerent is a violation of neutrality. 3 Phillim. Int. Law, 321. These rules spring from the inflexible duty of neutrals to observe strict impartiality. There must be no fraudulent act against belligerent rights—no attempt to depart from rigid neutrality. An intermixture or combination of neutral and hostile operations by the same person, taints the whole transaction. [The Fortuna] 3 Wheat. [16 U. S.] 236; [The Pizarro] 2 Wheat. [15 U. S.] 241. The loading of a contraband cargo in a neutral port, or the preparation of a vessel to run a blockade, though violative of international law, will not enable a belligerent to enter, lawfully, into such a port and capture the contraband cargo or vessel; for such an act would be a violation of neutral territory. [The Santissima Trinidad] 7 Wheat. [20 U. S.] 283. Besides, a breach of blockade requires some movement towards the blockaded port. It may be far away from the neutral country; yet the sailing of the vessel with intent to enter that far-off port, is always considered an overt act. The belligerent cannot trespass upon neutral sovereignty, by entering the neutral port itself, or making a capture within the marine league; for belligerent jurisdiction does not attach until the vessel is on the high seas, or within the municipal control of the belligerent captor. When, however, a government in the exercise of its municipal sovereignty passes a law of non-intercourse, there can be no question of neutral rights raised within its territorial jurisdiction; that is, its municipal laws are supreme within its own territory. Congress has passed penal laws against fitting out vessels in American ports for the slave trade, and it has, also, for the preservation of peace, and as an act of good faith towards other nations, forbidden the fitting out of hostile expeditions, and the enlistment of soldiers, to act against other powers with which the United States are in amity. Any act done within this country in violation of those statutes, by foreign subjects or our own citizens, is a direct breach of our mu-

nicipal laws, subjecting the offender to the prescribed penalties. The act of July 13, 1861, is a municipal and revenue statute.

Waiving all discussion of the constitutional question (which is purely municipal or intra-territorial), and looking only to the international laws of blockade, neutrals cannot sail on a voyage, with the intent to enter a blockaded port, without becoming lawful prize under the law of nations. A citizen of the United States, subject to the municipal law, may be forbidden by that law to do what a neutral would have a right to do on the high seas. A neutral, for instance, may lawfully enter any unblockaded port of the adverse belligerent, with a cargo not contraband, and depart therefrom; but if an American citizen (the United States being the other belligerent), should attempt to do so, the United States might subject him to severe penalties personally and confiscate his vessel and cargo, if thus found "adherent to the enemy," as was done by the act of July 6, 1812 [2 Stat. 778]. He is subject both to the law of nations and to the municipal law of his own domicil. It is competent for the United States, as has been judicially determined, to adopt embargo or non-intercourse acts with reference to foreign nations, and the existence of a similar power with respect to any part of this country in rebellion, has also been judicially maintained by several United States courts, since the present civil war commenced. If, then, a sale of contraband property, in a neutral country, to a belligerent, is a violation of neutrality under the law of nations (which law attempts to reconcile the rights of neutrals with the rights of belligerents), how under a municipal statute, which forbids all commercial intercourse, should a clearance of a vessel for an interdicted port, with or without contraband cargo, be considered? The allegiance of the citizen is due to his country, and he is bound by its laws. He is forbidden to trade with an insurrectionary district; "all commercial intercourse by and between the same and the citizens thereof and the citizens of the rest of the United States, shall cease and be unlawful;" "and all goods and chattels, wares and merchandise, coming from said state or section into the other parts of the United States, and all proceeding to such state or section by land or water, shall, together with the vessel or vehicle, &c., be forfeited to the United States." The overt act is not confined to actual entrance into the interdicted district—the success of the fraudulent voyage. If the offence was not complete until success crowned the enterprise, the object of the law would be defeated. The design of the statute is to prevent supplies from reaching the foe. Any movement towards aiding him—any act in furtherance of such a purpose, whether on land or water, is within the spirit of the statute. "Proceeding to" is a comprehensive phrase. If the prohibited intercourse is attempted on land, and a person loads a wagon and starts in furtherance of his illegal design, is he not proceeding in his fraudulent scheme—"proceeding to" violate his duty to the government? At what point on the journey will the offence become complete, if not at the first start? Is the rule different if the contemplated intercourse is through the agency of a vessel—to be by transportation on water instead of land? The goods are within the territorial jurisdiction of the United States, and owned by a United States citizen, and consequently are subject to the intra-territorial law. Every act done intra-territorially is subject to that law. If a sale of contraband property to a belligerent, in a neutral territory, is a violation of neutrality, à fortiori, such a sale in one belligerent country by any citizen or domiciled person thereof, is a breach of allegiance. This is not left to mere deduction from general principles. The act of August 6, 1861 [12 Stat. 319], provides that all property, of whatsoever kind, purchased or acquired, sold or given, with intent to use the same or suffer the same to be used, in promoting the insurrection, shall be confiscated. The act of May 20, 1862, supplementary to the act of July 13, 1861, after making provision for clearances in specified cases, and directing a refusal of clearances in others, whether the transportation is to be by land or water, imposes the penalty of forfeiture for an attempt to transport goods, &c., in violation of that act, or the regulations of the secretary of the treasury in pursuance thereof. The alleged offence in this case was subsequent to that act, and in violation of its provisions and of the regulations of the secretary of the treasury. The claimant had so far "proceeded" in his fraudulent operations as to procure a permit and actually to ship his goods. He had entered upon the interdicted enterprise. It was an "attempt" by which the penalty was incurred under the act of May 20, 1862, if not under the act of July 13, 1861. But there seems to be no difference in the true meaning of the terms employed between an "attempt" to transport and "proceeding to" transport. The scope and object of the two acts are the same, viz.: to prevent the interdicted intercourse. If such, however, is not the true construction of the act of July 13th, the goods in question would be held under the act of May 20th, and the necessary amendment of the libel allowed. The act of July 13th, properly construed, forbids each and every act done towards the execution of a design to carry on, without a license or permit, commercial intercourse between the interdicted and other states. It is violated not only when a vessel has actually sailed on the voyage with the goods on board, but the moment the goods are started, even on land, towards the forbidden destination. The application for the "permit" is evidence of the intention to proceed, and the exhibition of

fraudulent invoices in order to procure the needed permit, shows the intention to be fraudulent. The shipment of the goods under color of that permit is a step taken in execution of that fraudulent intent—is an overt act. Such goods, within the meaning of said statute, are "proceeding to" the interdicted port; and the shipper, under the act of May 20th, is guilty of an "attempt" to transport them in violation of the law. The act of July 6, 1812 (2 Stat. 778), was entitled "An act to prohibit American vessels from proceeding to, or trading with, the enemies of the United States, and for other purposes." It imposed forfeiture on every vessel that should depart from a United States port for a foreign port; and fine and imprisonment upon the master guilty of violating the act. Like penalties were provided against "an attempt to transport" by land. The decisions with reference to that and other statutes for non-intercourse and embargoes, indicate that the phrase "proceeding to" has received the construction given above. A departure, under one of its sections, and an attempt to transport, under another section, were respectively overt acts of "proceeding to" the interdicted port or district. The William and Grace, Hay & M. 76; The Rebecca. Id. 197; The Julia [Case No. 7,573]; The Friendship [Id. 5,124]; [The Penobscot v. U. S.] 7 Cranch [11 U. S.] 356; [The Richmond v. U. S.] 9 Cranch [13 U. S.] 102; [The Active v. U. S.] 7 Cranch [11 U. S.] 100; [The William King] 2 Wheat. [15 U. S.] 148.

The next two points as presented depend for solution upon the same principles. By the language of said act of July 13th, the prohibition is to be in force only "so long as such condition of hostility shall continue," and the president's proclamation of August 16, 1861, excepts from the interdict such of the states therein named (including Tennessee), and such parts of said states "as may maintain a loyal adhesion to the Union and the constitution or may be from time to time occupied and controlled by forces of the United States engaged in the dispersion of said insurgents." The claimant's proctor contends that "the condition of hostility," &c., is matter in pais, upon which the court is to hear the testimony of witnesses. He offers to prove by such witnesses that no such condition existed at Memphis when his shipment was made; also, the loyalty of that city, and that it was then occupied and controlled by United States forces. Indeed, for the purposes of this trial, the district attorney admits, as a matter in pais, that Memphis was so occupied and controlled at the time, and that hostilities were not flagrante bello, actually raging in that city at the time; submitting to the court, however. the question as to the competency of such modes of proof. The doctrine involved has been fully discussed in several cases decided by this court during the last fifteen months, and was virtually

settled long ago by the United States supreme court. The judiciary, under the constitution, cannot declare war or make peace. It is clothed with no such power, and cannot be clothed with it. Whatever power is vested by the constitution in one department of the government cannot be usurped by another. If one should wholly refuse to act, or should undertake to divest itself of, or abdicate, its legitimate functions, it would by no means follow that another department, expressly limited to specified duties, would thereby acquire ungranted powers. The abdication of executive functions by the executive, for instance, would not constitute the judicial the executive department of the country; nor would a failure or refusal of the legislative to pass needed statutes constitute the executive the law-making power. Each department has its true boundaries prescribed by the constitution, and it cannot travel beyond them. U. S. v. Ferrera, 13 How. [54 U. S.] 40; Little v. Bareme, 2 Cranch [6 U. S.] 170. The condition of peace or war, public or civil, in a legal sense, must be determined by the political department, not the judicial. The latter is bound by the decision thus made. The act of 1795 and the act of July 13, 1861, vest the president with the power to determine when insurrection exists, and to what extent it exists. The United States constitution vests congress with the power "to provide for calling forth the militia to execute the laws of the Union, suppress insurrection, and repel invasion;" "to declare war, * * * and make rules concerning captures on land and water." In the execution of that power, congress passed the acts cited above.

By the act of 1795 [1 Stat. 424], the supreme court says: "The power of deciding whether the exigency had arisen upon which the government of the United States is bound to interfere, is given to the president. * * * After the president has acted and called out the militia, is a circuit court of the United States authorized to inquire whether his decision was right? Could the court, while the parties were actually contending in arms for the possession of the government, call witnesses before it and inquire which party represented a majority of the people? * * * If the judicial power extends so far, the guarantee contained in the constitution of the United States is a guarantee of anarchy and not of order. Yet if this right does not reside in the courts when the conflict is raging; if the judicial power is at that time bound to follow the decision of the political, it must be equally bound when the contest is over. * * * At all events it (the power to decide) is conferred upon him (the president) by the constitution and laws of the United States, and must therefore be respected and enforced in its judicial tribunals." [Luther v. Borden] 7 How. [48 U. S.] 43, 44; also, see Martin v. Mott, 12 Wheat. [25 U. S.] 29–31. The same doctrine has been uniformly maintained from

the commencement of the government. The absurdity of any other rule is manifest. If during the actual clash of arms, courts were rightfully hearing evidence as to the fact of war, and either with or without the aid of juries, determining the question, they should have power to enforce their decisions. In case of foreign conflicts neither belligerent would be likely to yield to the decision: and in case of insurrection, the insurgents already in arms against the constitution and laws, would not cease their rebellion in obedience to a judicial decree. In short, the status of the country as to peace or war, is legally determined by the political and not the judicial department. When the decision is made the courts are concluded thereby, and bound to apply the legal rules which belong to that condition. The same power which determines the existence of war or insurrection, must also decide when hostilities have ceased,— that is, when peace is restored. In a legal sense, the state of war or peace is not a question in pais for courts to determine. It is a legal fact ascertainable only from the decision of the political department. [The Fortuna] 3 Wheat. [16 U. S.] 246; [U. S. v. Palmer] Id. 610; [The Divina Pastora] 4 Wheat. [17 U. S.] 52; [The Neustra Senora De La Caridad] Id. 497; [The Santissima Trinidad] 7 Wheat. [20 U. S.] 283; [Martin v. Mott] 12 Wheat. [25 U. S.] 19; [Rose v. Himely] 4 Cranch [8 U. S.] 241; [Foster v. Neilson] 2 Pet. [27 U. S.] 253; [Garcia v. Lee] 12 Pet. [37 U. S.] 511; [M'Elmoyle v. Cohen] 13 Pet. [38 U. S.] 315; [Luther v. Borden] 7 How. [48 U. S.] 1; [Kennett v. Chambers] 14 How. [55 U. S.] 46; [Christy v. Scott] Id. 283.

Under the act of July 13th, the president, on the 16th of August, 1861, proclaimed Tennessee in a state of insurrection. The legal status thus determined must remain so long as the condition of hostility continues. He has never made a counter proclamation, nor has peace been officially announced. As a legal condition that status is independent of actual daily strife in arms. A legal condition of hostilities may exist between this and a foreign nation, long after the last battle has been fought between the opposing armies. That condition ceases when peace is concluded through competent authority; not before. The distinction is between war flagrante, and nondum cessante. So far, however, is it from being true that the condition of hostilities does not still exist, that it is evident, even as a matter in pais, that Tennessee is still in an insurrectionary position. The presence of the United States armies in Memphis and elsewhere within that state, for the purpose of maintaining federal authority against armed insurgents, is a well-known necessity. There has been as yet no return of that state to a peaceful status under the constitution and laws; enabling the civil tribunals, by ordinary process, to enforce United States authority. Within any construction which could be fairly given to the president's proclamation, no "part of that state

maintains as yet a loyal adhesion to the Union and constitution." It is the duty of the president, however, to decide that point. Until he decides to the contrary, the court must hold that the legal condition of hostility continues. The exceptions in the proclamation, so far as made by the president, courts can and must enforce. But, if it be correct that by the terms of that proclamation the president intended to devolve on the courts the duty of determining judicially the status of a state, or part of a state, by an inquiry into its loyalty, or its occupation from time to time by United States forces, irrespective of a decision thereon by the executive; still courts could not thus acquire the power. The limits upon their constitutional and legal functions could not thus be enlarged. Political power could not be so delegated to them. They cannot be charged with any duties not judicial; "judicial power" alone is vested in them under the constitution; and the cases to which it extends are clearly defined. U. S. v. Ferreira, 13 How. [54 U. S.] 40. They cannot go beyond that well-defined limit. But the act of July 13th gives the conditions on which the proclamation issues, and declares its effect. It must pronounce what states or part of a state are in insurrection; for it is the official promulgation of the fact as found by the president. The exception quoted above does not change the rule. At the date of that document (August 16, 1861), Tennessee was proclaimed to be in insurrection, except as to such parts thereof where a certain condition of affairs existed, or might from time to time exist. How can any part of that state be brought within the exception for judicial cognizance? Only by the action of competent authority. The status of the part can be determined by the president alone. Has he officially decided the status by force of which the exception would operate, or courts can judicially ascertain Memphis to be no longer in hostile condition? Or, was not that language used solely with a view to the proviso in the 5th section of the act? It can hardly be supposed that he contemplated opening to unrestricted intercourse every town or district of an insurrectionary state, which the United States armies might occupy from time to time, on their march, irrespective of further action; thus leaving a town open to trade to-day and closed to-morrow, according to the shifting exigencies or convenience of military operations and without any treasury regulations therefor. It is evident, however, that the language used in that exception was not designed to leave so important a question open to doubt, uncertainty, or the contingencies of military movements from day to day. It was employed, perhaps, out of abundant caution, so as to announce that from time to time, exceptions would be put into practical effect by him according to the rules stated; or to bring such parts of those states within the terms of the proviso, so that the secretary of the treasury might make the

needed regulations therefor. A practical exemplification thereof is found in the case of South Carolina and Louisiana. Those states were included in the proclamation of August 16, 1861, and also in the previous proclamation of blockade: yet by another proclamation dated May 12, 1862, the president declares, that, by virtue of the powers vested in him by said act of July 13, the blockade of the ports of Beaufort, Port Royal, and New Orleans, should cease after the first day of June following, except as to contraband "persons, things, and information," and commercial intercourse be thereafter restored subject to the treasury regulations made for the purpose. Those ports had been for some time "occupied and controlled by United States forces." Again, under the act of June 7, 1862 [12 Stat. 422], the president once more (July 1, 1862) proclaimed Tennessee and the other states named therein, to be "in insurrection and rebellion," and there was no such exception as that quoted from the prior proclamation of August 16, 1861. True, the proclamation of July 1, 1862, had reference to the act of June preceding; but it serves to indicate the status of Tennessee as then officially recognised.

Under the proviso of the 5th section of the act of July 13, 1861, and by virtue of the act of May 20, 1862, the secretary of the treasury has made regulations, by compliance with which persons may trade with Memphis. The claimant sought a "permit" as required, so that he might have the benefit of the exception. He succeeded by fraud in procuring the desired paper, and then undertook, in further fraud of the law, to take contraband or prohibited articles to that port. Tennessee is interdicted to commercial intercourse, except on the specified conditions, and by special permit. The claimant must bring himself within the exceptions. [Murray v. The Charming Betsy] 2 Cranch [6 U. S.] 72; The Harmony [Case No. 6,081]. He not only has failed to do so; but on the contrary admits that he exhibited fraudulent invoices to the surveyor of the port, and violated the conditions on which alone a permit could be procured. The statute pronounces the penalty of forfeiture against his whole shipment. The packages in question are therefore declared forfeited, and costs and expenses awarded against the claimant.