Nott, Gh. J.,
delivered the opinion of the court:
In 1876 there was on the reservation near Fort Robinson a large body of Indians made up of different tribes and bands. Depredations were committed by individual members of this body, but the body as a whole, if not the tribes and bands which were parts of it, was virtually in amity with the United States. No such condition of affairs existed as would warrant *332 one in saying that every Indian was the enemy of every white man and every white man the enemy of every Indian. If the settlers, whose property was taken or destroyed, had organized and taken up arms and proceeded in military fashion against the Indians, the authorities of the United States, civil and military, would quickly have interposed and disarmed the insurgents and protected the Indians.
At the same time, in a part of the country 250 miles distant, was another body of Indians, composed in like manner of Indians of different tribes and bands, and the body was popularly known as Sitting Bull’s band. Sitting Bull was not an hereditary chief, and was not the leading war chief of this band of Indians, but he was the great intellectual power that ruled and led. It was he who incited them to war; it was he who led them into Canada; it was he who brought them back; it was he whom the United States thought it necessary to arrest in 1890; and it was his death that brought on the conflict which culminated in the battle of Wounded Knee. To all intents and purposes Sitting Bull’s band was like Victoria’s band or Black Hawk’s band. The three bands were made up of Indians of different tribes; the chiefs were not hereditary chiefs; the purpose of the first was to make war on the United States; the purpose of the second was plunder and rapine; the purpose of the third was to forcibly resist by arms all attempts of the Government to place them upon reservations.
During the summer of 1876 undoubtedly many individual members of the tribes on the reservation at Fort Bobinson slipped away individually and surreptitiously and joined Sitting Bull. It is probable that a majority of the fighting men of the Indian bands which are defendants in this case did so; it is doubtful whether a majority of all the members of any tribe — men, women, and children — remained upon the reservation. But the tribal action of a tribe can not be determined by the surreptitious actions of individual members. A majority may be decisive of a question when the majority act for the tribe on a question for tribal determination. In this case there was no tribal action whatever — nothing which was signified by the commands of a chief, by the resolution of a council, or by the vote of a tribe. The Indians who went away went as individuals, not to remove their tribe to a new habitat, but to join the hostiles. Under previous decisions of the court, when they joined the hostiles they lost their tribal *333 character, and are to be regarded as hostile soldiers belonging to and fighting under Sitting Bull’s flag. The tribe, as a tribe, remained on the reservation, drawing rations, receiving annuities, avowing allegiance to the United States.
Furthermore, the United States so elected to treat and deal with the Indians who remained upon the reservation. The agreement of September 20,1876, for the purchase of the Black Hills was negotiated with them and executed by them, and they were recognized as being the tribes, notwithstanding that material portions of each tribe had fought under Rain in the Face on the fatal 25th of June, and were still absent from the reservation.
If the Government had elected to regard those individuals of a tribe who had joined Sitting Bull as the tribe, and had treated those who remained on the reservation as prisoners of war, and had seized the lands of the Indians in the Black Hills as conquered territory, the courts undoubtedly would be concluded by the executive action and be obliged to hold that the defendants were not in amity. Conversely the courts must regard the Indians who joined Sitting Bull as individuals, who for the time being had expatriated themselves, and the body of Indians with whom the Government made the treaty of 1876 as the tribe.
This court is bound, both by the facts of the case and the action of the political branch of the Government. The depre-dators here belonged to the body of Indians which remained upon the reservation. To exempt the tribe from liability for the depredations of these reservation Indians because other members of the tribe had practically alienated themselves and gone over to a belligerent band would be to defeat the purpose of the statute and to award to the tribe immunity for its dep--redations while it enjoyed the advantages of amity with the United States. The purpose of-all the Indian intercourse acts was to impose on Indians in amity the obligations of peace. It does not lie in the mouth of these defendants to say, “ We are exempt from those obligations because some of our young men or all of our young men went off, surreptitiously and individually, and joined a band at war with the United States.”
If a minority can separate themselves from a tribe and become a band at war, so that depredations committed by members of the band are not within the jurisdiction of the court, logically and reciprocally a minority which segregate them *334 selves from a tribe at war, and remain under tbe protection of and in amity with the United States, must be deemed a band in amity as to depredations committed by their members. In the former case, Indians in amity can not be made responsible for the acts of Indians at war; in the latter, Indians in peace can not evade responsibility for their own acts by setting up the acts of Indians at war. If a minority can separate and become a band for the purposes of war, a minority can separate and become a band for the purposes of peace. The liability of war will attach to the one and the obligations of peace will rest upon the other.
The condition of the Ogalallas in 1876 illustrates the situation. Red Cloud, the principal chief, remained through all the vicissitudes of that eventful year upon the Red Cloud Reservation, adhering to the promise never to war upon the whites, which he had given when he signed the treaty of 1868. With him remained a considerable number of the Ogalallas, whether a majority or a minority is in dispute. Crazy Horse was a lesser chief of the Ogalallas at the head of a party who had gone into the Yellowstone country to hunt, and who were, in March, 1876, wintering in the recesses of the mountains on the head waters of the Tongue River. On the 17th of March the troops of the United States attacked the band of Crazy Horse, thereby beginning the war which culminated in the annihilation of Custer and his command in June, 1876, and ended with the surrender of Crazy Horse and the destruction of Lame Deer in May, 1877. During that period the Ogalallas living on the Red Cloud Reservation committed depredations, some of which are now the subject of the present action.
During that same period the Ogalallas under Crazy Horse continued to fight the troops of the United States. On the 26th of September, 1876, tbe Ogalallas under Red Cloud, on the reservation, entered into the agreement for the sale of the Black Hills country, and the first signature of the Ogalallas upon the agreement is “ Marpiya luta ” (Red Cloud). (19 Stat. L., pp. 254,257.) On the 24th November, 1876, General Mackenzie, operating against Crazy Horse, struck and annihilated the Cheyenne camp in the Big Horn Mountains. Some of the scouts fighting with him were Ogalallas from the reservation. “Dull Knife/’ says Captain Bourke, “called out to our Sioux and Cheyenne scouts: ‘ Go home — you have no business here; we can whip the white soldiers alone, but can’t fight you, too.’ ” *335 Others of the Cheyennes cried, “ You have killed and hurt a heap of our people, and you may as well stay now and kill the rest of us.” It required all of the influence of the great Sioux chief, Sintiega leska (Spotted Tail), to induce Crazy Horse to come in and surrender; and it was not until the 6th of May, 1877, that he and his band came in and laid down their arms at the agency. When that surrender of the Ogalallas at war took place, the agreement of the Ogalallas in amity had been ratified by Congress by the Act 28th February, 1877 (19 Stat. L., p. 254).
It is therefore apparent that at the time when the depredations were committed tbe Ogalallas were iu fact really divided by events into two bands. It is immaterial with which was the majority, and immaterial as to which had the better title to the tribal name. There were two bands, in fact, 250 miles apart, the one at war, the other in amity. On the band of Crazy Horse fell the retribution of war, a retribution as terrible as was ever inflicted by the army of a civilized nation, smiting men and women and children. On the band of Eed Cloud none of the horrors of war fell; but bn them there continued to rest the obligations of peace, and one of those obligations was that they should pay for property taken and destroyed by individual members of their band.
It is not to be understood by anything in this opinion that where a tribe was at war and a minority of the tribe remained on a reservation, having none of the characteristics of a band and giving no professions or acts indicative of amity, they will be recognized by the court as a band or be regarded, as being in amity. Such a minority, on the contrary, may be regarded as having had the legal characteristics of resident alien enemies; and the fact that they committed depredations while under the control or in the custody of the United States may be held to be something less than a compliance with the jurisdictional condition of belonging to a tribe, band, or nation in amity with the United States. It is not easy to lay down a distinctive definition of what is and what is not a band of Indians within the meaning of the jurisdictional act, but the general principle is plain that a tribe in amity can not be made responsible for the depredations of a band at war; and, conversely, that a band in amity can not escape responsibility for depredations committed by some of their own number because another band of the tribe is not in amity with the United States. The char *336 acteristics of tbe present ease are that the Ogalalla and Northern Cheyennes were each practically divided into two bands, separate and apart, the one in amity on their reservation, the other at a great distance at war, and that the Government recognized the former as the tribe, or at least as a distinctive' band, and dealt with it accordingly.
In this case it is certain that the depredation was committed by either Ogalallas or Cheyennes of the Red Clond Agency, bat it is not certain of which tribe the depredators were. The evidence is insufficient to identify either. The petitions against the Sioux Indians and the Northern Cheyenne Indians will therefore be dismissed, and a judgment against the United States for the depredations of unknown Indians will be entered for $800. So much of the petition against the Sioux Indians as relates to depredations committed in the years 1866, Í867, and 1873 is dismissed under the previous decision of the court in this case (32 C. Cls. R., 68),