# Legality of the Use of Military Commissions to Try Terrorists

The President possesses inherent authority under the Constitution, as Chief Executive and Commander in Chief of the Armed Forces of the United States, to establish military commissions to try and punish terrorists captured in connection with the attacks of September 11 or in connection with U.S. military operations in response to those attacks.

November 6, 2001

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

I. Background ..................................................................................................239

II. Military Commissions May Be Used to Try All Offenses Against the
   Laws of War ..............................................................................................240
   A. Congress Has Sanctioned the Broad Jurisdiction of Military
      Commissions to Try All Offenses Against the Laws of War..................241
   B. Even If Congress Had Not Authorized Creation of Military
      Commissions, the President Would Have Authority as Commander
      in Chief to Convene Them.......................................................................245
   C. The Use of Military Commissions to Inflict Punishments Without the
      Procedures Provided for Criminal Trials Under Article III, Section 2
      and the Fifth and Sixth Amendments Is Constitutionally Permissible ....249
      1. U.S. Citizens....................................................................................254
      2. Enemy Aliens Seized in the United States .......................................256

III. The President May Conclude That the Laws of Armed Conflict Apply to
    the Terrorist Attacks ................................................................................260
    A. Determining Whether War Exists Is a Question for the Political
       Branches .................................................................................................261
    B. The Terrorist Attacks Have Created a Situation That Can Properly
       Be Considered War.................................................................................263
       1. American Precedents .........................................................................264
       2. International Law Standards..............................................................270

IV. Under the Laws of War, the Terrorists Are Unlawful Combatants
    Subject to Trial and Punishment for Violations of the Laws of War ..............276

You have asked us to consider whether terrorists captured in connection with the attacks of September 11 or in connection with ongoing U.S. operations in response to those attacks could be subject to trial before a military court. The Uniform Code of Military Justice ("UCMJ"), 10 U.S.C. §§ 801-946, authorizes military commissions to try "offenders or offenses that by statute or by the law of war may be tried by military commissions." 10 U.S.C. § 821 (2000). The Supreme Court has interpreted identical language (then included in Article 15 of the

Articles of War in effect during World War II) to incorporate customary practice and to authorize trial by military commission[1] of any person subject to the laws of war for any offense under the laws of war. *See Ex parte Quirin*, 317 U.S. 1, 30 (1942).

We conclude that under 10 U.S.C. § 821 and his inherent powers as Commander in Chief, the President may establish military commissions to try and punish terrorists apprehended as part of the investigation into, or the military and intelligence operations in response to, the September 11 attacks.[*] As we outline in Part I, ample precedent establishes that military commissions may be used to try and punish (even with death) offenders under the laws of war. The President both has inherent authority as Commander in Chief to convene military commissions and has received authorization from Congress for their use to the full extent permitted by past executive practice. In Part II, we explain that determining whether the laws of war apply in this context is a political question for the President to determine in his role as Commander in Chief. In addition, we outline factors that may be considered, based on past precedents, in determining whether the laws of war are applicable in the present conflict with terrorist forces. We explain that a declaration of war is not required to create a state of war or to subject persons to the laws of war, nor is it required that the United States be engaged in armed conflict with another nation. The terrorists' actions in this case are sufficient to create a state of war de facto that allows application of the laws of war.

Part III addresses briefly some representative offenses that might be charged under the laws of war. We will address more thoroughly the charges that could be brought before a military commission and the procedures that would be required before such a commission in a subsequent memorandum.

## I. Background

A military commission is a form of military tribunal typically used in three scenarios: (i) to try individuals (usually members of enemy forces) for violations of the laws of war; (ii) as a general court administering justice in occupied territory; and (iii) as a general court in an area where martial law has been declared

---

[1] Section 821 refers to four forms of military tribunal: courts-martial, military commissions, provost courts, and "other military tribunals." *Id*. § 821. In this memorandum, we address military commissions, because that is the form of tribunal suited to hearing the charges contemplated here.

[*] Editor's Note: After this opinion was issued, the Supreme Court concluded in *Hamdan v. Rumsfeld*, 548 U.S. 557, 613 (2006), that military commissions established pursuant to a November 13, 2001 presidential order were inconsistent with the UCMJ and common Article 3 of the Geneva Conventions. Following *Hamdan*, Congress expressly authorized a system of military commissions pursuant to the Military Commissions Act of 2006, Pub. L. No 109-366, 120 Stat. 2600 (as amended by the Military Commissions Act of 2009, Pub. L. No. 111-84, tit. XVIII, 123 Stat. 2190, 2574).

and the civil courts are closed. *See generally* William Winthrop, *Military Law and Precedents* 836-40 (2d ed. 1920) ("Winthrop"). The commission is convened by order of a commanding officer and consists of a board of officers who sit as adjudicators without a jury. *See id.* at 835. The commission's decision is subject to review by the convening authority and is not subject to direct judicial review.

Military commissions have been used throughout U.S. history to prosecute violators of the laws of war. "Since our nation's earliest days, such commissions have been constitutionally recognized agencies for meeting many urgent governmental responsibilities related to war. They have been called our common law war courts." *Madsen v. Kinsella*, 343 U.S. 341, 346-47 (1952). Military commissions have tried offenders drawn from the ranks of aliens and citizens alike charged with war crimes arising as early as the Revolutionary War, the Mexican-American War, and the Civil War, and as recently as World War II. *See Quirin*, 317 U.S. at 32 n.10, 42 n.14. President Lincoln's assassins and their accomplices were imprisoned and even executed pursuant to convictions rendered by military commissions. Their offenses were characterized not as criminal matters but rather as acts of rebellion against the government itself. *See Military Commissions*, 11 Op. Att'y Gen. 297 (1865); *Ex parte Mudd*, 17 F. Cas. 954 (S.D. Fla. 1868) (No. 9899). Such use of military commissions has been repeatedly endorsed by federal courts, including as recently as this year. *See Mudd v. Caldera*, 134 F. Supp. 2d 138 (D.D.C. 2001).

Military commissions are not courts within Article III of the Constitution, nor are they subject to the jury trial requirements of the Fifth and Sixth Amendments of the Constitution. *See Quirin*, 317 U.S. at 40. Unlike Article III courts, the powers of military commissions are derived not from statute, but from the laws of war. *See Ex parte Vallandigham*, 68 U.S. (1 Wall.) 243, 249-53 (1863). That is, their authority derives from the Constitution's vesting of the power of Commander in Chief in the President. "Neither their procedure nor their jurisdiction has been prescribed by statute." *Madsen*, 343 U.S. at 347. Instead, "[i]t has been adapted in each instance to the need that called it forth." *Id.* at 347-48. "In general . . . [Congress] has left it to the President, and the military commanders representing him, to employ the commission, as occasion may require, for the investigation and punishment of violations of the laws of war." *Id.* at 346 n.9 (quoting Winthrop at 831).

## II. Military Commissions May Be Used to Try All Offenses Against the Laws of War

The Uniform Code of Military Justice ("UCMJ") expressly addresses the use of military commissions in Article 21. *See* 10 U.S.C. § 821. Because that provision contains an explicit congressional authorization for military commissions, we begin by examining in Part II.A the scope of that authorization. We conclude that

section 821 is quite broad and, by endorsing the customary uses of military commissions in U.S. military practice, authorizes military commission jurisdiction to try all offenses against the laws of war. Next, in part II.B, we explain that even if Congress had not sanctioned the use of military commissions to try all offenses against the laws of war, the President, exercising his authority as Commander in Chief, could order the creation of military commissions to try such offenses. Indeed, military commissions were created under presidential authority before they had any sanction in statutory law. Finally, in Part II.C, we examine constitutional objections that might be raised against the use of military commissions, particularly potential claims that they violate constitutional guarantees for trial by jury and a grand jury indictment. We conclude, as has the Supreme Court, that offenses charged under the laws of war before military commissions are outside the provisions of Article III and the Fifth and Sixth Amendments and thus that the rights to grand jury indictment and jury trial do not apply to such offenses.

## A. Congress Has Sanctioned the Broad Jurisdiction of Military Commissions to Try All Offenses Against the Laws of War

The UCMJ addresses the jurisdiction of military commissions in Article 21, which is section 821 of title 10 of the United States Code. Section 821 is phrased somewhat unusually, because it does not *create* military commissions and define their functions and jurisdiction. Instead, it refers to military commissions primarily to acknowledge their existence and to *preserve* their existing jurisdiction. As explained more fully below, military commissions had been created under the authority of the President as Commander in Chief and used to try offenses against the laws of war before there was any explicit statutory sanction for their use. Section 821, which is entitled "Jurisdiction of courts-martial not exclusive," thus states that "[t]he provisions of this chapter conferring jurisdiction upon courts-martial do not *deprive* military commissions . . . of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions." 10 U.S.C. § 821 (emphasis added). The jurisdictional provision for courts-martial that is cross-referenced is 10 U.S.C. § 818 (2000), which defines the jurisdiction of general courts-martial to include "jurisdiction to try any person who by the law of war is subject to trial by a military tribunal." By its terms, section 821 takes the existence of military commissions as a given and clarifies that the establishment of broad jurisdiction in courts-martial will not curtail the powers of military commissions.

By expressly preserving the jurisdiction of military commissions, section 821 necessarily provides a congressional authorization and sanction for their use. Indeed, the Supreme Court has concluded that identical language in the predecessor provision to section 821—Article 15 of the Articles of War—"*authorized* trial of offenses against the laws of war before such commissions." *Quirin*, 317 U.S. at

29 (emphasis added). *See also id*. at 28 ("By the Articles of War, and especially Article 15, Congress has explicitly provided, so far as it may constitutionally do so, that military tribunals shall have jurisdiction to try offenders or offenses against the law of war . . . .").

The fact that section 821 acknowledges and endorses the jurisdiction of an existing tribunal is important for properly understanding the scope of the authorization it contains. By its terms, the provision incorporates by reference the role of military commissions under the customary "law of war." Thus, the section states that military commissions have jurisdiction over all "offenders or offenses that by statute or by the law of war may be tried by military commissions." The apparent circularity of the language is explained by the fact that the section is endorsing the existing use of military commissions under military practice.

The history of the provision also makes it abundantly clear that its purpose was to express congressional approval for the traditional use of military commissions under past practice. When the language now codified in section 821 was first included in the Articles of War in 1916, it was explicitly intended to acknowledge and sanction the pre-existing jurisdiction of military commissions. The language was introduced as Article 15 of the Articles of War at the same time that the jurisdiction of general courts-martial was expanded to include all offenses against the laws of war. The new Article 15 stated (like current section 821) that the "provisions of these articles conferring jurisdiction upon courts-martial shall not be construed as depriving military commissions . . . of concurrent jurisdiction in respect of offenders or offenses that by the law of war may be lawfully triable by such military commissions." Act of August 29, 1916, 39 Stat. 619, 653. Judge Advocate General of the Army Crowder, the proponent of the new article, explained in testimony before the Senate that the military commission "is our common-law war court," and that "[i]t has no statutory existence." S. Rep. No. 64-130, at 40 (1916). The new Article 15 thus was not *establishing* military commissions and defining their jurisdiction. Rather, as General Crowder explained, it was recognizing their existence and preserving their authority: "It just saves to these war courts the jurisdiction they now have and makes it concurrent with courts-martial . . . ." *Id*.; *see also* S. Rep. No. 63-229, at 53 (1914) (testimony of Judge Advocate General Crowder before the House Committee on Military Affairs) (noting that the military commission "has not been formally authorized by statute" and explaining that the new Article 15 was designed to make clear that, through the expansion of the jurisdiction of courts-martial, the military commissions' "common law of war jurisdiction was not ousted").

In explaining the history of the provision now codified in section 821, the Supreme Court has described the testimony of Judge Advocate General Crowder as "authoritative." *Madsen*, 343 U.S. at 353. The Court thus determined that the effect of this language was to preserve for such commissions "the *existing* jurisdiction which they had over such offenders and offenses" under the laws of

war. *Id.* at 352 (emphasis added). As the Court noted, because the statute simply *recognized* the existence of military commissions, "[n]either their procedure nor their jurisdiction has been prescribed by statute." *Id.* at 347. As explained below, the fact that military commissions were used long before any reference to them appeared in the Articles of War demonstrates that the President has authority as Commander in Chief to create them without authorization (and free from any restriction) of Congress.

Given the text and history of section 821, the provision must be read as preserving the broadest possible sweep for the traditional jurisdiction exercised by military commissions before they were expressly mentioned in statutory law. The statute, in other words, simply endorses and incorporates by reference Executive Branch practice. The Supreme Court has adopted precisely this understanding of the section and has thus explained that "[b]y . . . recognizing military commissions in order to preserve their traditional jurisdiction over enemy combatants unimpaired by the Articles [of War], Congress gave sanction . . . to *any* use of the military commission contemplated by the common law of war." *In re Yamashita*, 327 U.S. 1, 20 (1946) (emphasis added); *see also id.* at 7 (stating that Congress "recognized the 'military commission' appointed by military command, as it had previously existed in United States Army Practice, as an appropriate tribunal for the trial and punishment of offenses against the law of war"). Similarly, the Court has explained that "Congress has incorporated by reference, as within the jurisdiction of military commissions, *all* offenses which are defined as such by the law of war." *Quirin*, 317 U.S. at 30 (emphasis added); *see also id.* at 35 (relying on the "long course of practical administrative construction by [the] military authorities").[2] Congress did not "attempt[] to codify the law of war or to mark its precise boundaries." *Yamashita*, 327 U.S. at 7. Instead, it simply adopted by reference "the system of military common law." *Id.* at 8.

Indeed, if section 821 were read as restricting the use of military commissions and prohibiting practices traditionally followed, it would infringe on the President's express constitutional powers as Commander in Chief. *Cf. Quirin*, 317 U.S. at 47 (declining to "inquire whether Congress may restrict the power of the Commander in Chief to deal with enemy belligerents" by restricting use of military commissions); *id.* (declining also to "consider the question whether the President is compelled by the Articles of War to afford unlawful enemy belligerents a trial before subjecting them to disciplinary measures"). A clear statement of congressional intent would be required before a statute could be read to effect such an infringement on core executive powers. *See, e.g.*, *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 466 (1989).

---

[2] The use of military commissions for members of the U.S. armed forces may be restricted by separate provisions in the UCMJ, and we do not address that issue here.

The congressional sanction for the use of military commissions is a permissible exercise of Congress's powers under the Constitution. Congress has authority not only to "declare War," but also to "raise and support Armies," and "make Rules for the Government and Regulation of the land and naval Forces." U.S. Const. art. I, § 8, cls. 11, 12, 14. To the extent military commissions are used for enforcing discipline within the armed forces of the United States, Congress has authority to sanction their use. In addition, Congress has authority to "define and punish . . . Offences against the Law of Nations." *Id*. art. I, § 8, cl. 10. Authorizing the use of military commissions to enforce the laws of war—which are considered a part of the "Law of Nations"—is certainly a permissible exercise of these authorities. *See, e.g.*, *Yamashita*, 327 U.S. at 7 (explaining that congressional sanction for military commissions was an "exercise of the power conferred upon it by Article I, § 8, cl. 10 of the Constitution to 'define and punish . . . Offenses against the Law of Nations . . .' of which the law of war is a part") (alteration in original); *id*. at 16 ("Congress in the exercise of its constitutional power to define and punish offenses against the law of nations, of which the law of war is a part, has recognized the 'military commission' appointed by military command, as it had previously existed in United States army practice, as an appropriate tribunal for the trial and punishment of offenses against the law of war.").[3] Or, to be more precise, it is permissible at least so long as any congressional regulations do not interfere with the President's authority as Commander in Chief. *Cf. Quirin*, 317 U.S. at 47 (declining to address "whether Congress may restrict the power of the Commander in Chief to deal with enemy belligerents" through regulations on military commissions); *cf. also Hamilton v. Dillin*, 88 U.S. (21 Wall.) 73, 87 (1874) (stating that the "President alone" is "constitutionally invested with the entire charge of hostile operations"). Given that section 821 simply gives sanction to the existing practice of the Executive in making use of military commissions, it does not on its face place any such restriction on the use of commissions.

---

[3] *See also Quirin*, 317 U.S. at 28 ("Congress, in addition to making rules for the government of our Armed Forces, has thus exercised its authority to define and punish offenses against the law of nations by sanctioning . . . the jurisdiction of military commissions to try persons for offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals."); *cf. Madsen*, 343 U.S. at 346 n.9 ("[I]t is those provisions of the Constitution which empower Congress to 'declare war' and 'raise armies,' and which, in authorizing the initiation of *war*, authorize the employment of all necessary and proper agencies for its due prosecution, from which this tribunal derives its original sanction. . . . The commission is simply an instrumentality for the more efficient execution of the war powers vested in Congress and the power vested in the President as Commander-in-chief in war.") (quoting Winthrop at 831).

## B. Even If Congress Had Not Authorized Creation of Military Commissions, the President Would Have Authority as Commander in Chief to Convene Them

The congressional authorization for military commissions in 10 U.S.C. § 821 endorses sufficiently broad jurisdiction for the commissions that there will likely be no need to rely solely on the President's inherent authority as Commander in Chief to convene commissions in the present circumstances. As noted above, Congress has endorsed the pre-existing practice of permitting military commissions to try "all offenses which are defined as such by the law of war." *Quirin*, 317 U.S. at 30. It is important, nevertheless, to note that the President has inherent authority as Commander in Chief to convene such tribunals even without authorization from Congress.

The Commander in Chief Clause, U.S. Const. art. II, § 2, cl. 1, vests in the President the full powers necessary to prosecute successfully a military campaign. It has long been understood that the Constitution provides the federal government all powers necessary for the execution of the duties the Constitution describes. As the Supreme Court explained in *Johnson v. Eisentrager*, "[t]he first of the enumerated powers of the President is that he shall be Commander-in-Chief of the Army and Navy of the United States. And, of course, grant of war power includes all that is necessary and proper for carrying these powers into execution." 339 U.S. 763, 788 (1950) (citation omitted); *see also Lichter v. United States*, 334 U.S. 742, 780 (1948) ("The powers of Congress and the President are only those which are to be derived from the Constitution but . . . the primary implication of a war power is that it shall be an effective power to wage the war successfully."); *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934) (stating that "the war power of the federal government" is "a power to wage war successfully"). One of the necessary incidents of authority over the conduct of military operations in war is the power to punish enemy belligerents for violations of the laws of war. The laws of war exist in part to ensure that the brutality inherent in war is confined within some limits. It is essential for the conduct of a war, therefore, that an army have the ability to enforce the laws of war by punishing transgressions by the enemy.[4]

It was well recognized at the time of the Founding, moreover, that one of the powers inherent in military command was the authority to institute tribunals for punishing violations of the laws of war by the enemy. In 1780, during the Revolutionary War, General Washington as Commander in Chief of the Continen-

---

[4] *Cf. Request of the Senate for an Opinion as to the Powers of the President "In Emergency or State of War,"* 39 Op. Att'y Gen. 343, 347-48 (1939) ("It is universally recognized that the constitutional duties of the Executive carry with them the constitutional powers necessary for their proper performance.").

tal Army appointed a "Board of General Officers" to try the British Major André as a spy. *See Quirin*, 317 U.S. at 31 n.9; *Proceedings of a Board of General Officers, Held by Order of His Excellency Gen. Washington, Commander in Chief of the Army of the United States of America, Respecting Major John André, Adjutant General of the British Army, September 29, 1780* (Philadelphia, Francis Bailey 1780), *as reprinted in Proceedings of a Board of General Officers Respecting Major John André* (New York 1867), *available at* http://archive.org/details/ proceedingsofboa00andr (last visited May 22, 2012). At the time, there was no provision in the American Articles of War providing for jurisdiction in a court-martial to try an enemy for the offense of spying. *See* George B. Davis, *A Treatise on the Military Law of the United States* 308 n.1 (1913) ("Davis") (explaining that the tribunal used to try André cannot properly be considered a court-martial, because under the then-existing Articles of War, courts-martial could not try members of the enemy forces for the offense of spying); Winthrop at 961 (reprinting American Articles of War of 1776). The term "Commander in Chief" was understood in Anglo-American constitutional thought as incorporating the fullest possible range of power available to a military commander. *See* John Yoo, *The Continuation of Politics by Other Means: The Original Understanding of War Powers*, 84 Calif. L. Rev. 167, 252-54 (1996). In investing the President with full authority as Commander in Chief, the drafters of the Constitution surely intended to give the President the same authority that General Washington possessed during the Revolutionary War to convene military tribunals to punish offenses against the laws of war.

The history of military commissions bears out this conclusion, because as a matter of practice military commissions have been created under the President's inherent authority as Commander in Chief without any authorization from Congress. In April, 1818, for example, General Andrew Jackson convened military tribunals to try two English subjects, Arbuthnot and Ambrister, for inciting the Creek Indians to war with the United States. *See* Winthrop at 464, 832. The subjects were convicted and executed accordingly. *Id*. As one author explained, General Jackson "did not find his authority to convene [these tribunals] in the statutory law, but in the laws of war." William E. Birkhimer, *Military Government and Martial Law* 353 (3d ed. 1914) ("Birkhimer"). Similarly, in the Mexican American War in 1847, General Winfield Scott appointed tribunals called "council[s] of war" to try offenses under the laws of war and tribunals called "military commission[s]" to serve essentially as occupation courts administering justice for occupied territory. *See, e.g.*, Winthrop at 832-33; Davis at 308. There was no statutory authorization for these tribunals, and they were thus instituted by military command (necessarily under authority derived from the

President's authority as Commander in Chief) without sanction from Congress.[5] In later practice, both functions (that is, the role of war courts and courts of occupation) were performed by tribunals known as "military commission[s]." Thus, after the outbreak of the Civil War, military commissions were convened to try offenses against the laws of war, *see* Davis at 308 n.2, and under the general orders drafted for the governance of the Army in 1862, commanders were authorized to convene military commissions to try offenses against the laws of war, *see* Winthrop at 833. It was not until 1863 that military commissions were even mentioned in a statute enacted by Congress. In that year, Congress authorized the use of military commissions to try members of the military for certain offenses committed during time of war. *See* Act of Mar. 3, 1863, § 30, 12 Stat. 731, 736. The statute, moreover, did not purport to *create* military commissions. Rather, it acknowledged that they could be used as alternatives to courts-martial in some cases.

As explained above, the current provision in section 821 of the UCMJ also does not *create* military commissions or define exhaustively their authority. Instead, its history shows that it was adopted to preserve the jurisdiction of what was recognized as a pre-existing tribunal. Precisely because it confirms that military commissions existed before any express congressional authorization, the history of section 821 also supports the conclusion that the President has constitutional authority to convene commissions even without legislation authorizing them.

Subsequent discussions of the use of military commissions by the Supreme Court reflect the same understanding that the use of military tribunals is a necessary part of the tools of a commander conducting a military campaign. For example, as the Court explained in *Yamashita*, "[a]n important incident to the conduct of war is the adoption of measures by the military commander, not only to repel and defeat the enemy, but to seize and subject to disciplinary measures those enemies who, in their attempt to thwart or impede our military effort, have violated the law of war." 327 U.S. at 11. Although the Court was addressing a situation in which Congress had recognized this power in the commander of armed forces, the logic of the Court's explanation suggests that the power to convene military commissions is an inherent part of the authority the Constitution confers upon the President by naming him Commander in Chief of the armed forces.[6]

---

[5] *See* Davis at 308 (explaining that military commissions "are simply criminal war-courts, resorted to for the reason that the jurisdiction of courts-martial, created as they are by statute, is restricted by law, and cannot be extended to include certain classes of offenses, which in war would go unpunished in the absence of a provisional forum for the trial of the offenders").

[6] *See also* Winthrop at 57 ([T]he "President is invested with a general and discretionary power to order statutory courts-martial for the army, *by virtue of his constitutional capacity as Commander-in-chief, independently of any article of war or other legislation of Congress*."); *id*. at 835 ("The President, as Commander-in-chief, may of course assemble military commissions as he may assemble courts-martial."); Birkhimer at 357 ("Military commissions may be appointed either under provisions of law in certain instances, or under that clause of the Constitution vesting the power of commander-in-

Similarly, the same conclusion is buttressed by the reasoning Justice Douglas advanced in support of the President's authority to establish the international war crimes tribunals after World War II without any authorization from Congress. As Justice Douglas explained:

> The Constitution makes the President the "Commander in Chief of the Army and Navy of the United States . . . ." Art. II, § 2, Cl. 1. His power as such is vastly greater than that of troop commander. He not only has full power to repel and defeat the enemy; he has the power to occupy the conquered country, and to punish those enemies who violated the law of war.

*Hirota v. MacArthur*, 338 U.S. 197, 207-08 (1948) (Douglas, J., concurring) (alteration in original, citations omitted); *see also id.* at 215 ("[T]he capture and control of those who were responsible for the Pearl Harbor incident was a political question on which the President as Commander-in-Chief, and as spokesman for the nation in foreign affairs, had the final say."). As the Supreme Court recognized in *Hirota*, the President's power as Commander in Chief extended to the novel creation of new, multinational tribunals to try the enemy for war crimes. Given that broad authority, the President's power surely extends to the appointment of military commissions consisting solely of American officials.

An opinion of the Attorney General issued at the end of the Civil War supports the same conclusion. In 1865, Attorney General Speed addressed the use of military commissions to try those accused in the plot to assassinate President Lincoln and explained that even if Congress had not provided for the creation of military commissions, they could be instituted by military commanders as an inherent incident of their authority to wage the military campaign:

> [M]ilitary tribunals exist under and according to the laws and usages of war in the interest of justice and mercy. They are established to save human life, and to prevent cruelty as far as possible. The commander of an army in time of war has the same power to organize military tribunals and execute their judgments that he has to set his squadrons in the field and fight battles. His authority in each case is from the law and usage of war.

*Military Commissions*, 11 Op. Att'y Gen. at 305. The Attorney General thus concluded that "in default of Congress defining . . . the mode of proceeding to ascertain whether an offense [against laws of war] has been committed," the

---

chief in the President, who may exercise it either directly or through subordinate commanders.") (footnote omitted).

commander of the armed forces could institute tribunals to undertake the task. *Id.* at 310.

The Supreme Court has never squarely addressed the question whether the President may convene military commissions wholly without congressional authorization. In *Quirin*, the Court expressly declined to decide "to what extent the President as Commander in Chief has constitutional power to create military commissions without the support of Congressional legislation." 317 U.S. at 29. And in later cases the Court has remained uncommitted. Thus, in *Madsen*, for example, the Court stated that "[i]n the absence of attempts by Congress to limit the President's power, it appears that, as Commander-in-Chief of the Army and Navy of the United States, he may, in time of war, establish and prescribe the jurisdiction and procedure of military commissions." *Madsen*, 343 U.S. at 348. At the same time, however, the Court cautioned that the "policy of Congress to refrain from legislating in this uncharted area does not imply its lack of power to legislate." *Id.* at 348-49.

For the reasons outlined above, we conclude that the best understanding of the Constitution is that the President does have the power, as Commander in Chief, to create military commissions to try enemy belligerents for offenses against the laws of war even in the absence of the congressional sanction for their use in section 821.

### C. The Use of Military Commissions to Inflict Punishments Without the Procedures Provided for Criminal Trials Under Article III, Section 2 and the Fifth and Sixth Amendments Is Constitutionally Permissible

The most likely constitutional issue to be raised concerning military commissions would be an objection to the denial of the rights to trial by jury in criminal cases and grand jury indictment as provided in Article III, Section 2 and the Fifth and Sixth Amendments.[7] Such objections would most likely be raised with respect to military commissions convened within the territorial United States, and we address them in that context. We believe that if a particular use of military commissions to try offenses against the laws of war is constitutionally permissible within the United States, it follows *a fortiori* that such a use is permissible to deal with enemy belligerents overseas, where many constitutional protections would not apply in any event.

---

[7] Article III, Section 2 provides: "The Trial of all Crimes, except in Cases of Impeachment; shall be by Jury . . . ." The Fifth Amendment provides: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces . . . ." The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."

It has long been settled that the guarantees to trial by jury in criminal cases contained in the Constitution were not intended to *expand* the rights to these procedures beyond those that existed at common law. *See, e.g.*, *Callan v. Wilson*, 127 U.S. 540, 549 (1888). As Justice Story explained in his Commentaries, in these provisions, the Constitution "does but follow out the established course of the common law in all trials for crimes," Joseph Story, 2 *Commentaries on the Constitution of the United States* § 1791 (1833), and thus the provisions in Article III and the Sixth Amendment are "to be taken as a declaration of what those rules were." *Callan*, 127 U.S. at 549. To the extent that certain offenses, even if technically deemed "criminal," could be tried without indictment and without a jury at common law, the Supreme Court has consistently held that they may be tried without a jury under the Constitution. Thus, petty offenses triable at common law without a jury may be tried without a jury under the Constitution, *see Schick v. United* States, 195 U.S. 65, 68-70 (1904), as can criminal contempts, *see, e.g.*, *In re Terry*, 128 U.S. 289, 303 (1888). *See also Lewis v. United States*, 518 U.S. 322, 325 (1996) ("It is well established that the Sixth Amendment, like the common law, reserves this jury trial right for prosecutions of serious offenses, and that 'there is a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision.'") (quoting *Duncan v. Louisiana*, 391 U.S. 145, 159 (1968)). The Fifth Amendment right to grand jury indictment similarly arises out of the common law. *See Smith v. United States*, 360 U.S. 1, 9 (1959) ("The use of indictments in all cases warranting serious punishment was the rule at common law" and "[t]he Fifth Amendment made the rule mandatory") (citations omitted); *Ex parte Wilson*, 114 U.S. 417, 423 (1885) ("The fifth amendment, declaring in what cases a grand jury should be necessary, . . . in effect, affirm[ed] the rule of the common law upon the same subject").

At the time of the Founding, it was well settled that offenses under the laws of war were a distinct category of offense, unlike criminal offenses against the civil law, and were subject to trial in military tribunals without the benefits of the procedures of the common law enshrined in the Constitution. The Articles of War of 1776, for example, made it clear that courts-martial could be convened to try offenders under the Articles without a jury or grand jury. *See* Winthrop at 967 (reproducing Articles). Similarly, as noted above, a "Board of General Officers" was used in 1780 to try the British Major André on the offense of spying. *See Quirin*, 317 U.S. at 31 n.9. Indeed, throughout the Revolutionary War, military tribunals were used to try offenders without a jury. *See id.* at 42 n.14. The text of the Constitution itself makes the distinct nature of military tribunals clear, as the Fifth Amendment expressly excludes "cases arising in the land or naval forces" from the guarantee of a grand jury indictment. U.S. Const. amend. V. *Cf. Middendorf v. Henry*, 425 U.S. 25, 49-50 (1976) (Powell, J., concurring) ("Court-martial proceedings, as a primary means for the regulation and discipline of the Armed Forces, were well known to the Founding Fathers. The procedures in such

courts were never deemed analogous to, or required to conform with, procedures in civilian courts."). Precisely because military discipline was viewed as wholly apart from the ordinary criminal law and the provisions in the Constitution relating to it, the Supreme Court has long recognized that military commissions do not exercise judicial power under Article III and are not subject to judicial review. *See, e.g.*, *Vallandigham*, 68 U.S. 243. Thus, under the settled understanding that the rights to jury trial and grand jury indictment do not extend beyond the cases where they were available at common law, those rights simply do not extend to trials before military tribunals for offenses against the laws of war. Such trials never included indictment or jury trial at the time of the Founding.

The Supreme Court endorsed precisely this reasoning to reject constitutional challenges to the use of military commissions to try and execute violators of the laws of war during and after World War II. In *Quirin*, for example, eight German saboteurs were apprehended in the United States by the FBI, turned over to the military, tried by military commission, and sentenced to death. *See* 317 U.S. at 18-24. In addressing a petition for habeas corpus, the Supreme Court addressed precisely the question at issue—"whether it is within the constitutional power of the National Government to place [these defendants] upon trial before a military commission"—without the protections of Article III and the Fifth and Sixth Amendments. *Id.* at 29.

The Court concluded that there was no constitutional barrier to use of the military commission. As the Court explained, the guarantees in Article III and the Fifth and Sixth Amendments must be understood in light of the common law at the time of the Founding. Military tribunals, the Court noted, "are not courts in the sense of the Judiciary Article," and juries had never been part of their procedures. *Id.* at 39. In particular, the Court pointed to a statute of 1806 concerning trials for spies as reflective of the contemporary understanding of the constitutional guarantees. That statute imposed the death penalty on alien spies "according to the law and usage of nations, by sentence of a general court martial." Act of Apr. 10, 1806, ch. 20, § 2, 2 Stat. 359, 371. As the Court explained, this "enactment must be regarded as a contemporary construction of both Article III, Section 2, and the Amendments as not foreclosing trial by military tribunals, without a jury, of offenses against the laws of war committed by enemies not in or associated with our Armed Forces." 317 U.S. at 41. Thus, the Court concluded that offenses cognizable under the laws of war in military tribunals at the time of the Founding could continue to be tried before such tribunals under the Constitution: "In the light of this long-continued and consistent interpretation we must conclude that § 2 of Article III and the Fifth and Sixth Amendments cannot be taken to have extended the right to demand a jury to trials by military commission, or to have required that offenses against the laws of war not triable by jury at common law be tried only in the civil courts." *Id.* at 40.

The Court reaffirmed that conclusion in subsequent cases. *See Yamashita*, 327 U.S. 1 (trial by U.S. military commission of Japanese military governor of the Phillippines for various war crimes committed under his command); *Johnson v. Eisentrager*, 339 U.S. 763, 787-90 (1950) (trial of German officers in China by U.S. military commission for aiding Japanese after Germany's surrender); *id*. at 786 ("The jurisdiction of military authorities, during or following hostilities, to punish those guilty of offenses against the laws of war is long established."); *cf. Duncan v. Kahanamoku*, 327 U.S. 304, 313-14 (1946) (referring to the "well-established power of the military to exercise jurisdiction over . . . enemy belligerents, prisoners of war, or others charged with violating the laws of war").[8]

As the *Quirin* and *Yamashita* Courts explained, their decisions rested upon long-established practice throughout the history of the United States—extending back to the Founding and before—demonstrating that any enemy belligerent charged with a violation of the laws of war may be tried by military tribunal. The Court traced the history of military commissions explained above and noted, among others, the use of boards functionally equivalent to military commissions in the Revolutionary War, *see Quirin*, 317 U.S. at 31 n.9, the Mexican-American War, *see id*. at 32 n.10, and during and after the Civil War, *id*. Military commissions, in fact, were used to try those charged with the assassination of President Lincoln. *See Military Commissions*, 11 Op. Att'y Gen. 297; *Mudd*, 17 F. Cas. 954.

The primary support for constitutional arguments to *restrict* the use of military commissions would be based on the Supreme Court's decision in *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866). There, the Court held that a military commission could not be used to try a U.S. citizen in the United States for alleged violations of the laws of war, except in areas where martial law has been proclaimed and the civil courts are closed. *See id*. at 121-22. In *Milligan*, a U.S. citizen resident in Indiana was arrested by the military, charged with providing aid and comfort to the Confederacy, tried by military commission, and sentenced to death. *See id*. at 107-08. In addressing a petition for a writ of habeas corpus, the Court rejected the suggestion that the President had full authority to use military commissions to the extent permitted by the "'laws and usages of war.'" *Id*. at 121. The Court refused even to inquire into what those usages might be, because "they can never be applied to citizens in states which have upheld the authority of the government, and where the courts are open and their process unobstructed." *Id*.; *see also id*. at 123 (noting that persons in military service are subject to military tribunals, but "*[a]ll other persons*, citizens of states where the courts are open . . . are guaranteed the inestimable privilege of trial by jury"); *id*. at 121-22 ("[N]o

---

[8] After World War II, entirely apart from the trials before the International Military Tribunal at Nuremberg, U.S. military commissions in Germany tried 177 Nazi officials and sentenced 12 to death. *See* Spencer J. Crona & Neal A. Richardson, *Justice for War Criminals of Invisible Armies: A New Legal and Military Approach to Terrorism*, 21 Okla. City U. L. Rev. 349, 381 (1996) ("Crona & Richardson").

usage of war could sanction a military trial there [in Indiana, where courts were always open] for any offence whatever of a citizen in civil life, in nowise connected with the military service."). In the Court's view, the constitutional guarantees to trial by jury and indictment by grand jury in a capital case could not be denied by resort to a military commission. The Court held open the possibility that military commissions could be used to try citizens if martial law had properly been declared in the area, which could happen in times of invasion when the area in question was actually in the theater of military operations. As the Court put it, the "necessity must be actual and present; the invasion real, such as effectually closes the courts and deposes the civil administration." *Id*. at 127.

We believe that the broad pronouncements in *Milligan* do not accurately reflect the requirements of the Constitution and that the case has properly been severely limited by the later decision in *Quirin*. As explained above, the *Quirin* Court set out a clear constitutional analysis under which it concluded that offenses triable by military commission under the laws of war were not within the commands of constitutional provisions guaranteeing certain procedures for criminal trials. As a result, the Court placed little or no significance on most of the factors cited in *Milligan*. The Court gave no weight to the fact that the civil courts were open where the German saboteurs had been captured. 317 U.S. at 23-24, 45. In addition, it rejected the idea that military jurisdiction would attach only if the defendants had entered the "theatre or zone of active military operations," *id*. at 38, and even declined to resolve arguments about whether one of the German saboteurs was a citizen (he claimed he had been a naturalized citizen, and therefore invoked *Milligan*) because it concluded that even if the defendant were a citizen, *Milligan* would not preclude his trial by military commission. The Court instead ruled that the decision in *Milligan* must be understood "as having particular reference to the facts" of that case. *Id*. at 45. The particular facts that the Court found significant appear to have been that the saboteur in *Quirin* had engaged in acts that made him a belligerent, while Milligan, "not being a part of or associated with the armed forces of the enemy, was a non-belligerent, not subject to the law of war." *Id*. The *Quirin* Court thus repeatedly emphasized that citizenship would not protect a person "from the consequences of a belligerency which is unlawful." *Id*. at 37; *see also id*. ("Citizens who associate themselves with the military arm of the enemy government" are properly subject to trial by military commission). Citizens who engaged in belligerent acts, thus, could be tried by military commission. *See also Colepaugh v. Looney*, 235 F.2d 429, 432 (10th Cir. 1956) ("[T]he petitioner's citizenship in the United States does not divest the Commission of jurisdiction over him, or confer upon him any constitutional rights not accorded any other belligerent under the laws of war."). To explain the limitations on *Milligan*, two scenarios merit consideration here: (1) the use of military commissions to try U.S. citizens seized in the United States, and (2) the use of military commissions to try enemy aliens seized in the United States.

### 1. U.S. Citizens

*Quirin* clearly establishes that U.S. citizens who act as belligerents may be tried by military commission for violations of the law of war. Nonetheless, as explained below, we caution that there may be some risk that there will be ambiguity concerning the application of *Quirin* and the distinction the *Quirin* Court drew between the case before it and *Milligan*.

As outlined above, the analysis employed in *Quirin* exempted offenses against the laws of war from the scope of the constitutional guarantees for trial by jury and grand jury indictment for crimes. The *Milligan* Court had relied on the same constitutional guarantees to hold that a military commission lacked jurisdiction and suggested that the facts that Milligan was a U.S. citizen and not in military service particularly compelled preserving his right to jury trial. *See* 71 U.S. at 119 ("[I]t is the birthright of every American citizen when charged with crime, to be tried and punished according to law."); *id*. at 118 (emphasizing that Milligan was "not a resident of one of the rebellious states, or a prisoner of war, but a citizen of Indiana for twenty years past, and never in the military or naval service"). The logic of the rationale in *Quirin*, however, suggests that even a citizen could be tried by military commission if he were properly charged with any violation of the laws of war. It was the nature of the offense—an offense against the laws of war—that removed it from the scope of constitutional provisions for jury trial and grand jury indictment. Thus, the Court noted that it was not status as an alien or citizen that was critical for making the use of a military commission constitutionally permissible. Rather, "offenders were outside the constitutional guaranty of trial by jury, not because they were aliens but only because they had violated the law of war." 317 U.S. at 44. In fact, *Quirin* made it explicit that U.S. citizenship alone does not suffice to invoke any limitation from *Milligan* on the jurisdiction of military commissions. The Court explained that "[c]itizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts are enemy belligerents" and may be tried under the laws of war. *Id*. at 37-38. As a result, the Court declined even to resolve the claim that one of the eight German saboteurs was actually a U.S. citizen. *See id*. at 45.

We believe that, properly understood, the constitutional analysis in *Quirin* demonstrates that any person properly charged with a violation of the laws of war, regardless of citizenship or membership in the armed forces (of this country or another power), may be tried by military commission. The critical point for constitutional analysis is that a person properly charged with an offense against the laws of war has no right to an indictment or trial by jury under Article III or the Fifth and Sixth Amendments. Citizenship and membership in the military are not determinative factors for constitutional purposes. A person can properly be chargeable of an offense against the laws of war (such as spying), after all, without

being in the armed forces of a belligerent nation. The critical distinction is the nature of the offense. *See United States v. Tiede*, 86 F.R.D. 227, 254 (U.S. Ct. Berlin 1979) ("*Quirin* holds that whether an individual is entitled to a jury trial is determined by the nature of the crime with which he is charged."). Offenses triable by the laws of war are not within the constitutional protections attached to criminal trials. As one district court recently held, "[u]nder *Quirin*, citizens and non-citizens alike—whether or not members of the military, or under its direction or control, may be subject to the jurisdiction of a military commission for violations of the law of war." *Mudd v. Caldera*, 134 F. Supp. 2d 138, 145-46 (D.D.C. 2001); *see also Colepaugh*, 235 F.2d at 432 ("[T]he petitioner's citizenship in the United States does not divest the Commission of jurisdiction over him, or confer upon him any constitutional rights not accorded any other belligerent under the laws of war.").

The Supreme Court, however, did not go so far as to hold in *Quirin* that its constitutional rationale undermined *Milligan* entirely. Instead, the Court declined to "define with meticulous care the ultimate boundaries of the jurisdiction of military tribunals," 317 U.S. at 45-46, and stated simply that the holding in *Milligan* should be construed as "having particular reference to the facts" in that case, *id*. at 45. The facts that were particularly relevant appear to have been that the saboteur in *Quirin* who claimed citizenship had engaged in acts that made him a belligerent. Milligan, in contrast, was not in military service, and the Court stressed that he was not an "enemy belligerent" and, "not being a part of or associated with the armed forces of the enemy, was a non-belligerent, not subject to the laws of war." *Id*. at 45; *see also Milligan*, 71 U.S. at 121-22 (emphasizing that *Milligan* was "a citizen in civil life, in nowise connected with the military service"). Thus, the line that the Court ultimately drew in *Quirin* to distinguish *Milligan* may be read to suggest that a citizen (not in the U.S. military) can be tried by military commission *when he acts as a belligerent. See* 317 U.S. at 37. That condition was most clearly met where citizens "associate themselves with the military arm of the enemy government." *Id*. The distinction suggests that *Milligan* can be explained on the basis that the actions charged in *Milligan* did not amount to acts of belligerency. Even under this approach to *Quirin*, we conclude that in the context of the current conflict, any actions by U.S. citizens that amount to hostile acts against the United States or it citizens (and certainly participation in biological attacks, the attacks of September 11, or similar attacks) would make a person a "belligerent" subject to trial by military commission under *Quirin*.

We caution, however, that applying this standard may raise some ambiguities. The *Milligan* decision holds out at least the possibility that some charges that may be articulated under the law of war (such as the charge of giving aid and comfort to the enemy used in *Milligan*) may not, in some circumstances, amount to acts of belligerency triable by military commission. Exactly which acts place a person in the category of an "enemy belligerent" under *Quirin* thus may be a subject of

litigation. In addition, it might be argued that *Quirin* should be read as imposing a brighter-line test under which citizens are triable by military commission when they "associate themselves with the military arm of the enemy government." 317 U.S. at 37. That standard, it could be claimed, is difficult to apply here because there are no organized armed forces of another belligerent nation facing the United States. For the reasons outlined above, we conclude that such an approach does not reflect the proper constitutional analysis and is not the proper reading of *Quirin*. Nonetheless, it raises a potential source of litigation risk.

In short, although we conclude that a U.S. citizen found to have engaged in actions that are properly chargeable as offenses under the laws of war could constitutionally be tried by military commission in the United States, we caution that in some circumstances there could be litigation risks involved in establishing the exact application of the Supreme Court's decisions.

## 2. Enemy Aliens Seized in the United States

Even if *Milligan* might raise litigation risks for the use of military commissions to try citizens, it should not raise the same difficulties for trying *aliens* charged with violations of the law of war. The *Milligan* Court repeatedly stressed the importance of citizenship in describing Milligan's rights, and even though the Supreme Court has extended many constitutional protections to aliens within the United States, the distinction between the rights of citizens and aliens, especially in times of war, retains vitality today. As the Supreme Court explained in *Johnson v. Eisentrager*, 339 U.S. 763, 771 (1950), whatever protections may be extended to aliens in time of peace, "[i]t is war that exposes the relative vulnerability of the alien's status."[9] Since the Alien Enemy Act of 1798, 1 Stat. 577 (codified as amended at 50 U.S.C. § 21), it has been established that in times of declared war, the President may seize enemy aliens and intern or deport them. This "Executive power over enemy aliens, undelayed and unhampered by litigation, has been deemed, throughout our history, essential to war-time security." *Eisentrager*, 339 U.S. at 774. As the Court in *Eisentrager* explained, since an alien citizen of an enemy nation may constitutionally be deprived of liberty by Executive action solely on the basis of his citizenship during time of war, "no reason is apparent why an alien enemy charged with having committed a crime should have greater

---

[9] It is well established that during war enemy aliens are not entitled to the same constitutional rights as citizens. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 587 (1952) ("The government's power to terminate its hospitality [to aliens] has been asserted and sustained by this Court since the question first arose. War, of course, is the most usual occasion for extensive resort to the power."); *Ex parte Colonna*, 314 U.S. 510, 511 (1942) (noting "the principle recognized by Congress and by this Court that war suspends the right of the enemy plaintiffs to prosecute actions in our courts."); *Cummings v. Deutsche Bank und Discontogesellschaft*, 300 U.S. 115, 120 (1937) ("By exertion of the war power, and untrammeled by the due process or just compensation clause, Congress enacted laws directing seizure, use, and disposition of property in this country belonging to subjects of the enemy.").

immunities from Executive action." *Id*. at 784. As the Court concluded, the "Constitution does not confer a right of personal security or an immunity from military trial and punishment upon an alien enemy engaged in the hostile service of a government at war with the United States." *Id*. at 785. Although there is no "government at war" with the United States in the current scenario, we believe that the same constitutional analysis would surely apply to aliens who have entered the United States to carry on a terrorist war at the behest of any foreign power.[10]

There is some authority for the view that *Milligan* provides a broad standard guaranteeing the right to jury trial for both citizens and aliens for offenses that might be charged as crimes wherever the civil courts are open, as long as the offenses did not take place in the field of military operations or other peculiarly military territory. An opinion of the Attorney General issued at the end of World War I took this approach. In 1918, Attorney General Gregory relied on *Milligan* to advise President Wilson that a military commission would not properly have jurisdiction to try a Russian national seized at the Mexican border as he attempted to enter the United States to conduct acts of sabotage in the service of the German government. *See Trial of Spies by Military Tribunals*, 31 Op. Att'y Gen. 356, 357 (1918) (the "1918 Opinion"). The opinion reasoned that the guarantee of a jury trial in criminal matters in Article III, Section 2 and the guarantees of the Fifth and Sixth Amendments should be read to constrain the use of military commissions. It concluded that "military tribunals, whether courts-martial or military commissions, cannot constitutionally be granted jurisdiction to try persons charged with acts or offences committed outside of the field of military operations or territory under martial law or other peculiarly military territory." *Id*. at 361. Attorney General Gregory proceeded from that premise to conclude that the offense of spying—made triable by military commission—must be narrowly construed to involve actually passing through an enemy's lines of defenses in an area of military operations. *See id*.; *see also id*. at 357 (emphasizing that defendant "had not entered any camp, fortification or other military premises of the United States").[11]

_____

[10] We do not intend to address exhaustively here the Supreme Court's decisions extending constitutional protections to aliens within the United States. We note, however, that the Court has explained such protections by stating that they extend to aliens who are *lawfully* in the United States and who have "developed substantial connections with this country," *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990), or as the Court recently put it, have "accepted some societal obligations," *id*. at 273. It seems unlikely, to say the least, that terrorists here on long-term missions to plot hostile acts could satisfy both of these conditions.

[11] Specifically, the Attorney General addressed Article 82 of the Articles of War, which stated that "Any person who in time of war shall be found lurking or acting as a spy in or about any of the fortifications, posts, quarters, or encampments of any of the armies of the United States, or elsewhere, shall be tried by a general court-martial or by a military commission, and shall, on conviction thereof, suffer death." 31 Op. Att'y Gen. at 358. He concluded that, because of constitutional constraints, the term "or elsewhere" could not be read to permit the trial by military commission of a defendant who was not seized in peculiarly military territory. *Id*. at 361.

We believe that the 1918 Opinion is best understood as an attempt to articulate the current state of the law under then-existing Supreme Court decisions and that it does not reflect the best constitutional analysis. *See, e.g.*, *id*. at 359 (stating that *Milligan* is "authoritative" concerning "application of these Constitutional provisions to the question of the scope of military jurisdiction"). Indeed, the rationale in the 1918 Opinion has been thoroughly undermined by the Court's later decision in *Quirin*. First, in *Quirin*, the Court explained at length that Article III, Section 2 and the Fifth and Sixth Amendments do not apply to trials by military commission for offenses against the laws of war and were not intended to expand the right to jury trial that existed at common law at the time of the Founding. *See* 317 U.S. at 39-43. *Quirin* thus rejected precisely the constitutional rationales upon which the Attorney General relied. Second, Attorney General Gregory relied on those constitutional rationales to *expand Milligan* to preclude the trial of aliens as well as citizens by military commission. He gave no particular rationale for extending those protections to aliens charged with hostile acts in time of war. In *Quirin*, moreover, the Court took the opposite route and concluded that, despite *Milligan*, even citizens were properly triable by military commission if they engaged in a belligerency unlawful under the laws of war. *See id*. at 37-38, 45.

Finally, *Quirin* can be read as rejecting even Attorney General Gregory's specific approach to requiring some particular nexus between the offense and "peculiarly military territory," even for the particular offense of spying under the Articles of War. As noted above, to preserve the jurisdiction of civil courts, the 1918 Opinion reached the specific conclusion that spying required the defendant to have crossed into "the field of military operations" or "other peculiarly military territory." 31 Op. Att'y Gen. at 361; *see also id*. at 357 (noting that the accused "had not, so far as appears, been in Europe during the war, so had not come through the fighting lines or field of military operations"). The saboteurs in *Quirin* relied expressly on that opinion to argue that they had not crossed through any military lines, had not been seized in military territory, and thus should not be subject to trial before a military commission. *See* Cyrus Bernstein, *The Saboteur Trial: A Case History*, 11 Geo. Wash. L. Rev. 131, 152-54 (1943) (summarizing briefs before Supreme Court).[12] In addressing charges under the same Article of War, the *Quirin* Court, without citing the 1918 Opinion, rejected these claims: "Nor are petitioners any the less belligerents if, as they argue, they have not actually committed or attempted to commit any act of depredation or entered the theatre or zone of active military operations." 317 U.S. at 38; *see also id*. at 36-37 ("[E]ntry upon our territory in time of war by enemy belligerents . . . for the

---

[12] *See also Eisentrager*, 339 U.S. at 780 (noting arguments in *Quirin*: "None of the places where they were acting, arrested, tried or imprisoned were, it was contended, in a zone of active military operations, were not under martial law or any other military control, and no circumstances justified transferring them from civil to military jurisdiction").

purpose of destroying property used or useful in prosecuting the war, is a hostile and war-like act. It subjects those who participate in it without uniform to the punishment prescribed by the law of war for unlawful belligerents."). The saboteurs in *Quirin* were seized in Chicago and New York (not "peculiarly military territory") before they had completed any acts of sabotage, yet they were still chargeable as spies and subject to trial before a military commission.[13] We believe that *Quirin* more accurately reflects the law. *Milligan* does not provide a substantial basis for precluding the trial of aliens by military commission for offenses against the laws of war even where the courts are open in the United States.[14]

In any event, the particular circumstances addressed in the 1918 Opinion will likely have little relevance to the current crisis. First, many terrorists that come into U.S. custody will likely be apprehended overseas and will plainly be triable by military commission for violations of the laws of war under *Johnson v. Eisentrager*, 339 U.S. 763 (1950). Constitutional concerns related to the use of military commissions within the United States thus will not arise. Second, the 1918 Opinion addressed the unusual factual scenario of a defendant seized at the border "the moment he touched foot upon United States territory," 31 Op. Att'y Gen. at 357, who had not completed any acts of espionage or sabotage, and who had never even approached a military base. It was in addressing that fact pattern under the particular offense of spying under Article 82 of the Articles of War that the Attorney General concluded that there must be some connection to the field of operations or particularly military territory. One year later, Attorney General Palmer made clear that the particular facts were critical as he concluded, upon learning different facts in the same case, that a military court properly *did* have jurisdiction to try the *same defendant*. See *Trial of Spy by Court Martial*, 40 Op. Att'y Gen. 561 (1919). He explained that, where the defendant had "crossed into our territory" and was arrested "about a mile distant from encampments where were stationed officers and men engaged in protecting the border against threatened invasion from the Mexican side," *id.*, a military court properly had jurisdiction.[15] In the current situation, a scenario similar to that addressed in the 1918 Opinion likely will not arise. Aliens apprehended in the United States would likely be charged in connection with completed hostile acts of unlawful belligerency or

---

[13] In setting out the background of the case, the Court did note in a footnote that both of the beaches on which the saboteurs landed were within areas designated the "Eastern Sea Frontier" and the "Gulf Sea Frontier" by the military, *see* 317 U.S. at 20 n.1, but it did not rely on these facts in its decision.

[14] We also note that the 1918 opinion might have been influenced by the fact that it was issued on November 25, 1918, two weeks after the armistice with Germany had been signed.

[15] Because Attorney General Palmer based his decision entirely on the changed facts (which brought the defendant within particularly military territory) and explicitly stated that "[t]his expression of my views should not be treated as overruling the opinion of my predecessor," we believe it is still necessary to address the legal analysis of the 1918 Opinion, as we have above.

conspiracy related to those acts. There would be no credible argument that the definitions of the offenses under the laws of war should be construed narrowly so as not to include deliberate acts of mass murder that took approximately 3,000 lives.\*

## III. The President May Conclude That the Laws of Armed Conflict Apply to the Terrorist Attacks

As explained above, 10 U.S.C. § 821 sanctions the full uses of the military commission established by custom and Executive practice in the United States military. That practice, as noted above, has permitted military commissions to try all offenses against the laws of war. *See, e.g.*, *Quirin*, 317 U.S. at 30 ("Congress has incorporated by reference, as within the jurisdiction of military commissions, *all* offenses which are defined as such by the law of war.") (emphasis added); *Yamashita*, 327 U.S. at 20 ("Congress gave sanction . . . to any use of the military commission contemplated by the common law of war."). The critical question for determining whether military commissions can properly be used here, therefore, is whether the terrorist attacks have created a situation to which the laws of war apply.[16] That is, are the terrorist acts subject to the laws of war at all, or are they solely criminal matters to be treated under the municipal criminal law of the United States or a particular State?

As outlined below, it would be difficult—or impossible—to articulate any precise multi-pronged legal "test" for determining whether a particular attack or set of circumstances constitutes "war" justifying application of the laws of war— or to use the modern terminology, whether it is an "armed conflict" justifying use of the "laws of armed conflict." As the Supreme Court recognized long ago, determining whether a "war" exists depends largely on pragmatic considerations. As the Court put it in evaluating whether President Lincoln could properly invoke the laws of war by imposing a blockade on the southern states at the beginning of the Civil War, a conflict "becomes [a war] by its accidents—the number, power, and organization of the persons who originate and carry it on." *The Prize Cases*, 67 U.S. (2 Black) 635, 666 (1862). Precisely because it is a question that rests on pragmatic judgments that critically affect the national defense and vital matters of foreign policy, it is a determination that is properly left to the political branches, and particularly to the President. We explain in Part III.A below that the courts should defer to a presidential determination that the laws of armed conflict apply.

---

\* Editor's Note: When this opinion was issued, this sentence referenced the taking of "over 4,500 lives," which was based on the information known at that time.

[16] Because we conclude, as explained below, that the current conflict warrants application of the laws of war and thus justifies the use of military commissions under this standard, we need not and do not address whether the President's inherent powers as Commander in Chief would extend further to permit the use of military commissions in other situations.

In Part III.B, we outline more specific principles that can be derived from precedents to demonstrate that the present attacks have created a set of circumstances that properly merit invocation of the laws of war.[17] The scale of these attacks, the number of deaths they have caused, and the massive military response they have demanded makes it virtually self-evident that the present situation can be treated as an armed conflict subject to the laws of armed conflict.

## A. Determining Whether War Exists Is a Question for the Political Branches

Part of the reason it is difficult to articulate any broadly applicable "test" for determining whether a war exists is that the courts have quite properly concluded that that question (and thus the triggering of the laws of war) is one for the political branches. Early in the Nation's history the Supreme Court recognized that Congress has authority to acknowledge a state of war, and that its decision to do so, whether formally and fully or partially and by degrees, is not subject to judicial question. *See Talbot v. Seeman*, 5 U.S. (1 Cranch) 1, 28 (1801) ("[C]ongress may authorize general hostilities, in which case the general laws of war apply to our situation; or partial hostilities, in which case the laws of war, so far as they actually apply to our situation, must be noticed."); *The Three Friends*, 166 U.S. 1, 63 (1887) ("[I]t belongs to the political department to determine when belligerency shall be recognized, and its action must be accepted according to the terms and

---

[17] We note that the Supreme Court's decision in *Quirin* also demonstrates that, at least if those charged before a military commission are being held within the territorial United States, they would be able to file a petition for habeas corpus to have an Article III court test whether their cases fell within the jurisdiction of a military commission—that is, whether the offenses charged properly "set[] forth a violation of the law of war." *Quirin*, 317 U.S. at 46; *see also id.* at 29 (suggesting that some acts, even if considered violations of the laws of war in some countries or by some authorities, "would not be triable by military tribunal here . . . because they are not recognized *by our courts* as violations of the law of war") (emphasis added); *Yamashita*, 327 U.S. at 9 ("[T]he Executive branch of the Government could not, unless there was suspension of the writ, withdraw from the courts the duty and power to make such inquiry into the authority of the commission as may be made by habeas corpus."); *Colepaugh*, 235 F.2d at 431 (holding that on habeas review court may inquire into "applicability of the law of war to a particular case"). *But cf. Johnson v. Eisentrager*, 339 U.S. 763, 787-90 (1950) (holding that the writ of habeas corpus is not available to aliens held outside United States territory).

It is unclear to what extent a court would inquire into the exact question here—namely, whether the current situation is a "war" permitting application of the laws of war. In *Quirin*, the existence of a war was definitively established by a congressional declaration of war, and the Court inquired solely into whether the specification of the charges against the saboteurs sufficiently "alleges violation of the law of war." 317 U.S. at 36. In *Yamashita*, the Court addressed a question closer to the one here as it assessed a claim that military commissions could not be used after the cessation of hostilities—a claim it rejected. *See* 327 U.S. at 11-13. Although, as explained in text, determining whether the laws of war apply is properly a political question, it is possible that courts will not consider themselves bound by *every* determination of a political branch of the government that the laws of war apply. Thus, setting out the rationales that justify treating the current situation as "war" may be useful for this purpose as well.

intention expressed."); *see also, e.g.*, 3 *Cumulative Digest of United States Practice in International Law 1981-1988*, at 3444 (1995) ("*U.S. Practice*") ("The Courts have also treated the fundamental issue of whether an armed conflict is taking place for purposes of international or domestic law as a question to be decided by the political branches.") (collecting authorities); *Verano v. De Angelis Coal Co.*, 41 F. Supp. 954, 954 (M.D. Pa. 1941) ("'It is the well-settled law that the existence of a condition of war must be determined by the political department of the government; that the courts take judicial notice of such determination and are bound thereby.'") (quoting *Hamilton v. McClaughry*, 136 F. 445, 449 (C.C.D. Kan. 1905)); *The Ambrose Light*, 25 F. 408, 412 (S.D.N.Y. 1885) (where question of recognizing belligerent rights arises, courts "must follow the political and executive departments, and recognize only what those departments recognize"); *United States v. One Hundred and Twenty-Nine Packages*, 27 F. Cas. 284, 289 (E.D. Mo. 1862) ("[T]he status of the country as to peace or war, is legally determined by the political and not the judicial department. When the decision is made the courts are concluded thereby, and bound to apply the legal rules which belong to that condition.").

We conclude that, even without any action by Congress to acknowledge a state of war, the President, in his constitutional role as Commander in Chief, and through his broad authority in the realm of foreign affairs, *see, e.g.*, *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936), also has full authority to determine when the Nation has been thrust into a conflict that must be recognized as a war and treated under the laws of war. In *The Prize Cases*, the Supreme Court explained that it was up to the President to determine that a state of war existed that warranted according to the southern States the "character of belligerents." 67 U.S. at 670. The judiciary, the Court noted, would be bound by his determinations in evaluating whether the laws of war applied to the blockade the President had instituted:

> Whether the President in fulfilling his duties, as Commander-in-chief, in suppressing an insurrection, has met with such armed hostile resistance, and a civil war of such alarming proportions as will compel him to accord to them the character of belligerents, is a question to be decided *by him*, and this Court must be governed by the decisions and acts of the political department of the Government to which this power was entrusted. . . . The proclamation of blockade is itself official and conclusive evidence to the Court that a state of war existed . . . .

*Id.*; *see also The Protector*, 79 U.S. (12 Wall.) 700, 701-02 (1871) (relying on presidential proclamations to determine start and end dates for the Civil War); *Salois v. United States*, 33 Ct. Cl. 326, 333 (1898) (stating that if the government

had treated a band of Indians as at war, "the courts undoubtedly would be concluded by the executive action and be obliged to hold that the defendants were not in amity").

By making the President Commander in Chief of the armed forces, the Constitution must be understood to grant him the full authorities required for him to effectively defend the Nation in the event of an armed attack. Necessarily included among those powers must be the ability to determine whether persons responsible for an attack should be subject to punishment under the laws of war. We outlined above our conclusion that the President's powers as Commander in Chief must include the authority to convene military commissions to enforce the laws of war. For largely the same reasons, the Commander in Chief's power should include authority to determine when the armed forces are engaged in a conflict that merits application of the laws of war. Use of the laws of war, after all, can be a key component in a strategy for conducting and regulating a military campaign. The ability to apply the laws of war means the ability to punish transgressions by an enemy against those laws, and thereby to compel an enemy to abide by certain standards of conduct. There can be no basis for withdrawing from the Commander in Chief the authority to determine when the Nation has been subjected to such an attack as warrants the use of the laws of war to deal with the enemy.[18]

## B. The Terrorist Attacks Have Created a Situation That Can Properly Be Considered War

Although the determination whether the current situation merits application of the laws of war is properly committed to the discretion of the President as Commander in Chief, there are some standards that the President could take into account. Under principles that can be gleaned both from American precedents and sources addressing the international laws of armed conflict, these factors indicate that the laws of armed conflict are properly applicable here. As the Supreme Court put it in evaluating whether President Lincoln could properly invoke the laws of war by imposing a blockade on the southern states at the beginning of the Civil War, a conflict "becomes [a war] by its accidents—the number, power, and organization of the persons who originate and carry it on." *The Prize Cases*, 67 U.S. at 666. Where an organized force is carrying on a campaign of violence that

---

[18] It is a familiar principle that decisions made by the President in undertaking the defense of the Nation in his role as Commander in Chief are committed to his sole discretion and are not subject to review. *See, e.g.*, *Martin v. Mott*, 25 U.S. 19, 30 (1827) (question whether circumstances require calling out the militia is committed to the discretion of the President: "[T]he authority to decide whether the exigency has arisen belongs exclusively to the President, and . . . his decision is conclusive upon all other persons."); *see also Stewart v. Kahn*, 78 U.S. (1 Wall.) 493, 506 (1870) ("The measures to be taken in carrying on war . . . are not defined [in the Constitution]. The decision of all such questions rests wholly in the discretion of those to whom the substantial powers involved are confided by the Constitution.").

reaches a sufficient level of intensity, it may be deemed an "armed conflict" by the President, thereby justifying application of the laws of armed conflict, including trials for the violation of those laws.[19] As explained below, the terrorist attacks meet that test.

## 1. American Precedents

The political branches of the government, in whom the Constitution vests all of the war power, have long recognized that formal requirements are not the touchstone for application of the laws of war.[20] Actions based on that understanding, moreover, have repeatedly been upheld by the Supreme Court. Thus, for example, in the Quasi War with France, Congress exercised its power to authorize the seizure of French vessels, effectively using the rights of war, without declaring war. The Supreme Court recognized that Congress could take precisely such steps to use principles of the laws of war without any formal declaration. *See, e.g.*, *Bas v. Tingy*, 4 U.S. (4 Dall.) 37, 43 (1800) ("Congress is empowered to declare a general war, or Congress may wage a limited war; limited in place, in objects, and in time.");[21] *see also Existence of War with the Seminoles*, 3 Op. Att'y Gen. 307 (1838) (explaining that war may exist "although no formal declaration of war has been made" and can even exist "without the sanction of Congress").[22]

In addition, it is well established in Executive practice that war can exist (and the laws of war can be applied) even if the hostile parties are not two independent

---

[19] Acknowledging that the laws of armed conflict may be applied to the present conflict does *not* mean in any way acknowledging the terrorists as legitimate combatants with any rights under the laws of armed conflict. To the contrary, based on their actions to date, the terrorists are all unlawful combatants stripped of any protection under the laws of armed conflict and are subject to trial for their violation.

[20] Because most U.S. precedents addressing application of the laws of armed conflict date from World War II or before, they use the terminology of "law of war." For consistency with the source material, we follow that terminology in this portion of the discussion.

[21] *See also* U.S. Army Field Manual, *The Law of Land Warfare*, FM 27-10, ch. 1, ¶ 9 (July 1956, as updated) ("[A] declaration of war is not an essential condition to the application of this body of law.").

[22] Similarly, courts have recognized that the conflict in Vietnam was a war for purposes of applying the laws of war, even though Congress never declared war. *See, e.g.*, *United States v. Anderson*, 38 C.M.R. 386 (C.M.A. 1968). Accordingly, violations of the laws of war during Vietnam could be prosecuted as war crimes by military tribunals. In court-martial proceedings arising out of the incidents at My Lai, the Army Court of Military Review stated that "all charges could have been laid as war crimes." *United States v. Calley*, 46 C.M.R. 1131, 1138 (A.C.M.R. 1973); *see also* 3 *U.S. Practice* at 3451. The court explained why the defendant was charged under the Uniform Code of Military Justice by citing paragraph 507(b) of chapter 8 of the U.S. Army Field Manual, *The Law of Land Warfare*, FM 27-10, which states that "the United States normally punishes war crimes as such only if they are committed by enemy nationals or by persons serving the interests of the enemy State. Violations of the laws of war committed by persons subject to the military law of the United States will usually constitute violations of the Uniform Code of Military Justice and, if so, will be prosecuted under that Code." *Calley*, 46 C.M.R. at 1138.

sovereigns. Thus, at the outbreak of the Civil War, President Lincoln ordered a blockade of the southern states—an action that effectively invoked the rules of war—without any declaration of war and without any sovereign state as an enemy. In *The Prize Cases*, the Supreme Court addressed this action in the context of determining whether certain ships seized for attempting to run the blockade were lawfully captured as prizes. They would be lawful prizes only if the laws of war applied. In concluding that the prizes were lawful, the Court explained: "The parties belligerent in a public war are independent nations. But it is not necessary to constitute war, that both parties should be acknowledged as independent nations or sovereign States." 67 U.S. at 666;[23] *accord United States v. Pacific R.R.*, 120 U.S. 227, 233 (1887).[24] The mere fact that the terrorists are non-state actors, therefore, poses no bar to applying the laws of war here.

American precedents also furnish a factual situation that is more closely analogous to the current attacks to the extent that they involve attacks by non-state actors that do not take place in the context of a rebellion or civil war. The analogy comes from the irregular warfare carried on in the Indian Wars on the western frontier during the nineteenth century. Indian "nations" were not independent, sovereign nations in the sense of classical international law, nor were Indian tribes rebels attempting to establish states. *Cf. Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831) (Marshall, C.J.) (describing Indians tribes as "domestic dependent nations"). Nevertheless, the Supreme Court has explained that the conflicts between Indians and the United States in various circumstances were properly understood as "war." Thus, in *Montoya v. United States*, 180 U.S. 261 (1901), the Court (for purposes of a compensation statute passed by Congress) examined whether certain attacks were carried out by Indians from tribes "in amity" with the United States, which the Court approached by determining whether the Indians were at "war." The Court explained that the critical factor was whether the Indians' attacks were undertaken for private gain or as a general attack upon the United States: "If their hostile acts are directed against the Government or against all settlers with whom they come in contact, it is evidence of an act of war." *Id.* at 266; *see also id.* (critical factor is whether "their depredations are part

---

[23] *See also Pan American World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1013 (2d Cir. 1974) ("[W]ar can exist between quasi-sovereign entities.").

[24] Similarly, in *Hamilton v. McClaughry*, 136 F. 445 (D. Kan. 1905), the court concluded that the Boxer Rebellion in China was a "war" sufficient to confer jurisdiction on a general court-martial to try a soldier for an offense "during time of war." Even though the Boxers were not a government and could not be recognized as a sovereign nation, the court found that "there prevailed in China a condition of war" sufficient to justify a court-martial in applying punishments that apply during time of war. *Id.* at 451; *see also Arce v. State*, 202 S.W. 951, 951 (Tex. Crim. App. 1918) (holding that a "war" existed when a "force organized at Monterey [in Mexico] by the direction and under the authority of the Carranza de facto government"—an insurgent group—attacked U.S. troops sent into Mexico, and thus that prisoners seized in the engagement should not be tried in Texas courts for murder).

of a hostile demonstration against the Government or settlers in general, or are for the purpose of individual plunder").

Similarly, after the Modoc Indian War of 1873, the Attorney General opined that prisoners taken during the war who were accused of killing certain officers who had gone to parley under a flag of truce were subject to the laws of war and could be tried by a military commission. *See The Modoc Indian Prisoners*, 14 Op. Att'y Gen. 249 (1873). The Attorney General acknowledged that "[i]t is difficult to define exactly the relations of the Indian tribes to the United States," but concluded that "as they frequently carry on organized and protracted wars, they may properly, as it seems to me, be held subject to those rules of warfare which make a negotiation for peace after hostilities possible, and which make perfidy like that in question punishable by military authority." *Id*. at 253. Several Indian prisoners were tried by military commission and executed.

The Attorney General reached a similar conclusion in 1871 in addressing the conduct of persons who had sold ammunition and rifles to hostile Indians. By statute, trading with Indians without a license was already prohibited. The Attorney General concluded, however, that trading with Indians "in open and notorious hostility to the United States at the time" constituted an offense under the Articles of War and could be tried by military commission. *Unlawful Traffic with Indians*, 13 Op. Att'y Gen. 470, 471 (1871). He explained that he was assuming "such a state of hostility on the part of the Indians as amounts to war," and acknowledged that "[t]his state, in our peculiar relations with Indian tribes, is perhaps not susceptible of an exact definition." *Id*. at 472. He concluded:

> It is not necessary to the existence of war that hostilities should have been formally proclaimed. When any Indian tribes are carrying on a system of attacks upon the property or persons, or both, of the settlers upon our frontiers, or of the travelers across our Territories, and the troops of the United States are engaged in repelling such attacks, this is war in such a sense as will justify the enforcement of the articles of war against persons who are engaged in relieving the enemy with ammunition, etc.

*Id*.

It is true that many situations involving application of the laws of war in the past have involved conflicts between sovereigns or quasi-sovereign entities (including, for example, rebel movements attempting to establish governments). But that fact should not be understood as in any way precluding application of the laws of armed conflict to widespread terrorist violence. In the past, usually only a sovereign or quasi-sovereign entity attempting to establish itself as a government over a substantial territory could have the resources to mount and sustain a series of attacks of sufficient intensity to raise the question of "war" or "armed conflict."

The terrorist network now facing the United States has found other means to finance its campaign while operating from the territory of several different nations at once. That change, however, cannot be considered to somehow exempt terrorist networks from the standards demanded by the laws of armed conflict and the punishments that would apply when the terrorists undertake violent attacks in violation of those laws. Simply by operating outside the confines of the traditional concepts of nation-states, terrorists cannot shield themselves from the prohibitions universally commanded by the laws of armed conflict and trial for violations of those laws. The examples from the Indian Wars above here provide an apt analogy. Indian tribes did not fit into the western European understanding of nation states—a difficulty that Attorneys General acknowledged. But that posed no bar to applying the laws of war when the United States was engaged in armed conflict with them.

Moreover, there is nothing in the logic of the laws of armed conflict that in any way restricts them from applying to a campaign of hostilities carried on by a non-state actor with a trans-national reach. To the contrary, the logic behind the laws suggests that they apply here. Generally speaking, the laws are intended to confine within certain limits the brutality of armed conflict, which might otherwise go wholly unchecked. *Cf. The Prize Cases*, 67 U.S. at 667 (the laws of war "all tend to mitigate the cruelties and misery produced by the scourge of war"). The ability to punish violations of the laws of armed conflict is critical for deterring all foreign entities from undertaking any acts that violate those laws. If terrorists could somehow be exempt from being tried for violations of the laws of war simply because they do not need to rely upon a government—or a quasi-sovereign structure controlling territory—the purposes of the laws of war would be defeated.[25]

Under the precedents outlined above, the terrorist acts are plainly sufficient to warrant application of the laws of war. The attacks fit exactly the terms used in the

---

[25] It also bears noting that the terrorists do share one significant characteristic with the case of rebels or insurgents. Rebels typically are attempting to establish a government to change the political order or enforce their political will on an existing government. Some definitions of war, indeed, describe it as the effort to impose political will by force. *See, e.g.*, Carl von Clausewitz, *On War* 101 (A. Rapoport ed., Pelican Classics 1968) (1832) ("War therefore is an act of violence intended to compel our opponents to fulfil our will."); *id.* at 119 ("War is . . . a continuation of political commerce, a carrying out of the same by other means."). The terrorist attacks share this characteristic: they are designed to enforce a political will by arms. The attacks were directed against the government and people of the United States in an effort to force the United States to alter its foreign policies by the application of armed force. That is a classic description of the objectives of war. Thus, even though Usama bin Laden does not have any territory that he controls and cannot be said to operate as a quasi-sovereign entity, he was in effect acting in the same manner as a foreign power in attempting to enforce his political will on the United States by force of arms. While that aspect of the terrorist campaign is certainly not *necessary* for the attacks to be deemed an armed conflict, it does demonstrate that the current terrorist attacks share much in common with more familiar examples of armed hostilities subject to the laws of armed conflict.

cases above (which, as explained below, also closely parallel standards applied in international sources addressing the laws of armed conflict). The terrorists have engaged in a "system of attacks upon" the United States, that are part of a "hostile demonstration against the government [and people] in general." 13 Op. Att'y Gen. at 472. Usama bin Laden has made it abundantly clear that he has called Muslims worldwide to a "jihad against the U.S. government, because the U.S. government is unjust, criminal and tyrannical." CNN Interview with Osama bin Laden, *Osama Bin Laden v. the U.S.: Edicts and Statements* (Mar. 1997), *available at* http://www. pbs.org/wgbh/pages/frontline/shows/binladen/who/edicts.html (last visited July 26, 2012); *see also* World Islamic Front Statement, *Jihad Against Jews and Crusaders* (Feb. 23, 1998), *available at* http://www.fas.org/irp/world/para/docs/980223-fatwa. htm (last visited July 26, 2012) ("The ruling to kill the Americans and their allies—civilians and military—is an individual duty for every Muslim who can do it in any country in which it is possible to do it . . . . We—with Allah's help—call on every Muslim who believes in Allah and wishes to be rewarded to comply with Allah's order to kill the Americans and plunder their money wherever and whenever they find it.").

In prosecuting this self-proclaimed war, the terrorists carried out a widespread and coordinated attack against military and civilian targets on September 11 that resulted in the loss of approximately 3,000 lives. That death toll surpasses that at Pearl Harbor, and rivals the toll at the battle of Antietam in 1862, one of the bloodiest engagements in the Civil War. The attacks, moreover, did not involve a single, isolated event. Rather, even if one looks solely to the events of September 11, they involved the coordinated hijacking in different parts of the country of four separate aircraft that were then used as guided weapons. And if one looks beyond September 11, the attacks appear to be the culmination of a lengthy and sustained campaign that also includes the bombings of the World Trade Center in 1993, the Khobar Towers in Saudi Arabia in 1996, the U.S. embassies in Kenya and Tanzania in 1998, and the U.S.S. Cole in 2000. Especially when viewed as part of that continuing series of attacks, the most recent events plainly rise to the level of a systematic campaign of hostilities that justifies application of the laws of armed conflict.[26]

---

[26] Indeed, compared to previous incidents found by the Executive Branch to trigger the application of the laws of armed conflict, Al Qaeda's terrorism campaign falls well within United States practice. On December 3, 1983, two unarmed U.S. navy planes flying regular, routine reconnaissance flights were fired upon by hundreds of Syrian anti-aircraft guns and surface-to-air missiles. The United States responded to the attack the following day with airstrikes on the Syrian positions from which the gunfire and missiles had come. Two U.S. planes were shot down, and one officer was taken prisoner. The United States declared that the officer was entitled to prisoner of war status. According to a State Department press guidance, under the Geneva Conventions of 1949, "'[a]rmed conflict' includes any situation in which there is hostile action between the armed forces of two parties, regardless of the duration, intensity or scope of the fighting and irrespective of whether a state of war exists between the two parties." 3 *U.S. Practice* at 3456-57.

In addition, the "troops of the United States are engaged in repelling such attacks" on a massive scale. 13 Op. Att'y Gen. at 472. Days after the attacks, Congress swiftly exercised its war powers to pass a joint resolution authorizing the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001."[27] The President has not only described the current situation as a "war," he has also directed partial mobilization of the Ready Reserve (thus putting at his disposal one million members of the Ready Reserve and alerting 50,000 reservists so far), he has dispatched three carrier battle groups and dozens of additional aircraft to the region of Afghanistan, and he has launched air attacks against military targets in Afghanistan. In addition, fighter jets continue to patrol the skies over most major American cities. The level of the military response determined upon by the political branches of the government in itself, in our view, justifies the conclusion that the laws of war can be invoked.

Finally, a further factor is virtually conclusive in itself in establishing that the attacks rise to the level of an armed conflict. In response to the attacks, NATO has already taken the unprecedented step of invoking Article 5 of the North Atlantic Treaty, which provides that an "armed attack against one or more of [the parties] shall be considered an attack against them all." North Atlantic Treaty art. 5, Apr. 4, 1949, 63 Stat. 2241, 2244, 34 U.N.T.S. 243, 246; *see also* Statement of NATO Secretary General Lord Robertson (Oct. 2, 2001), *available at* http://www.nato.int/ docu/speech/2001/s011002a.htm (last visited May 17, 2012) ("it has now been determined that the attack against the United States on 11 September was directed from abroad and shall therefore be regarded as an action covered by Article 5 of the Washington Treaty"). Thus, under the mechanism provided in a treaty (which is part of the "supreme Law of the Land" under Article 6 of the Constitution, U.S. Const. art. VI, § 2), it has already been determined by a unanimous vote (including the vote of the United States) that the terrorist acts are an "armed attack" warranting an international response. Indeed, at least one NATO member, Great Britain, has already participated with the United States in launching attacks in response to the terrorist acts, and others have pledged their participation for future military actions. Similarly, both the Organization of American States ("OAS") and Australia and New Zealand have determined that parallel provisions in their mutual defense treaties applying to "armed attacks" have also been activated.[28]

---

[27] Pub. L. No. 107-40, 115 Stat. 224 (Sept. 14, 2001). Such a resolution was not necessary for the President to order a military response under his authority as Commander in Chief, but we note that the resolution was clearly an exercise of Congress's war power. The resolution itself acknowledges in the preamble that "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." 115 Stat. at 224.

[28] *See* Security Treaty Between Australia, New Zealand and the United States of America art. 2, Sept. 1, 1951, 3 U.S.T. 3420, 3422, 131 U.N.T.S. 83, 86 ("ANZUS Pact"); White House, Fact Sheet,

These actions already demonstrate recognition by other nations that the events of September 11 constituted "armed attacks" necessitating a military response.

In short, the terrorist acts were not isolated acts of criminal violence; rather, they were an attack against the government and people of the United States. We believe that "this is war in such a sense as will justify the enforcement of the articles of war." 13 Op. Att'y Gen. at 472.

## 2. International Law Standards

The precedents under American law outlined above are sufficient to establish conclusively that at least as of September 11, terrorist attacks on the United States had created a situation that would justify a conclusion that the laws of war properly apply. We realize that if a decision is made to use military commissions, it will also be important to justify American actions to our allies and others internationally. We therefore explain below that under sources of international law there are also ample authorities that could be cited to support a decision to apply the laws of war to the current conflict.

There is, of course, no treaty to which the United States is a party that applies by its terms to the current conflict with a terrorist organization and that would subject terrorists to the laws of war—or as it is now more commonly referred to in international law, the "laws of armed conflict." Our discussion, therefore, turns to some extent on principles reflective of "customary international law" concerning the breadth of the laws of armed conflict. Citation of such principles, however, should not be misunderstood to suggest that these principles are "law" in the sense that they bind the President as Commander in Chief. Rather, they are cited to demonstrate that, in the field of international law, certain principles have received sufficient recognition that they could be credibly cited as reflecting customary practice among nations. The President may choose to enforce these standards as a matter of policy (and may determine as a matter of policy to have the Armed

---

*Operation Enduring Freedom Overview: Campaign Against Terrorism Results* (Oct. 1, 2001), *available at* http://2001-2009.state.gov/s/ct/rls/fs/2001/5194.htm (last visited Aug. 4, 2012) (noting that "Australia offered combat military forces and invoked Article IV of the ANZUS Treaty, declaring September 11 an attack on Australia"); Inter-American Treaty of Reciprocal Assistance art. 3(1), Sept. 2, 1947, 62 Stat. 1681, 1700, 21 U.N.T.S. 77, 95 ("Rio Treaty") ("an armed attack by any State against an American State shall be considered as an attack against all the American States"); Meeting of Consultation of Ministers of Foreign Affairs, Organization of American States, *Terrorist Threat to the Americas* (Sept. 21, 2001), *available at* http://www.oas.org/OASpage/crisis/RC.24e.htm (last visited May 22, 2012) (resolving "[t]hat these terrorist attacks against the United States of America are attacks against all American states and that in accordance with all the relevant provisions of the Inter-American Treaty of Reciprocal Assistance (Rio Treaty) and the principle of continental solidarity, all States Parties to the Rio Treaty shall provide effective reciprocal assistance to address such attacks and the threat of any similar attacks against any American state, and to maintain the peace and security of the continent").

Forces of the United States adhere to similar standards), but they are not "law" that limits the President as Commander in Chief.

Many of the same standards distilled from the American precedents outlined above are also reflected in international law sources addressing application of the laws of armed conflict. It bears emphasis at the outset that the term "law of war" used in 10 U.S.C. § 821 refers to the same body of international law now usually referred to as the "laws of armed conflict." *See, e.g.*, *Quirin*, 317 U.S. at 30-31 (explaining that the "law of war" incorporates the "common law of war" and looking to "universal agreement and practice" and "practice here and abroad" in determining scope of the laws of war, including army manuals from Germany and Britain); *cf.* International Criminal Tribunal for the Former Yugoslavia: Decision in *Prosecutor v. Dusko Tadic*, Oct. 2, 1995, 35 I.L.M. 32, 60 (1996) ("*Prosecutor v. Tadic*") (noting changes in terminology). That refinement in terminology is not without significance, because it is designed to reflect more accurately the substantive reach of the international law restraints (and potential punishments) placed upon the conduct of armed conflicts. The laws of armed conflict are not restricted to situations of declared war—or even undeclared war—between nation states. Certain standards apply to any situation involving armed hostilities that have reached a sufficient level of intensity to be considered "armed conflict." Understanding the broader scope of this body of law is particularly important, because the fact that the terrorist attacks do not fit neatly into a classical concept of "war" may (improperly) pose an initial stumbling block hindering understanding of how the laws of armed conflict properly apply here.

To begin with, the major conventions that set out international law standards governing international conflicts between states are not limited by the formal concept of "war." Rather, each of the four Geneva Conventions of 1949, for example, applies "to all cases of declared war *or of any other armed conflict* which may arise between two or more of the High Contracting Parties." *See, e.g.*, Geneva Convention Relative to the Protection of Civilian Persons in Time of War art. 2, Aug. 12, 1949, 6 U.S.T. 3516, 3518, 75 U.N.T.S. 287, 288 (emphasis added); *see also* 3 *U.S. Practice* at 3453 ("[T]here need be neither a formal declaration of war nor a recognized state of war in order for the 1949 Geneva Conventions to come into effect. The occurrence of *de facto* hostilities is sufficient."). Thus, even in the context of hostilities between nations, it is the existence of a set of facts— hostilities that amount to armed conflict—that triggers application of the provisions of the Geneva Conventions.

It is true that the requirements in the Geneva Conventions apply by their terms solely to conflicts between states. Thus, those conventions are not triggered by a conflict solely with terrorists. But that does not mean that there are not principles of the laws of armed conflict that apply in other scenarios. The complete set of restrictions in those conventions is not the only source of the laws of armed

conflict that restrict the conduct of armed hostilities under international law.[29] For example, common Article 3 of the Geneva Conventions was expressly designed to provide a form of safety net to establish minimal standards of humanitarian conduct that would govern in certain conflicts not covered by the Conventions. Thus, while the Geneva Conventions were designed to address international armed conflict, common Article 3 sets out some basic standards of humanitarian conduct that the parties are bound to apply "[i]n the case of armed conflict not of an international character" occurring within the territory of a Party. *See e.g.*, Geneva Convention Relative to the Protection of Civilian Persons in Time of War art. 3, 6 U.S.T. at 3518.[30] Similarly, the 1996 Amended Protocol II to the 1980 U.N. Convention on Prohibitions or Restrictions on the use of Certain Conventional Weapons (to which the United States is a party) further elaborates some aspects of the laws of armed conflict that apply in such "internal" armed conflicts. S. Treaty Doc. No. 105-1, at 39 (1997). These provisions make it plain that the laws of armed conflict may apply to hostilities conducted by a non-state actor. They also illustrate that the trigger for applying these requirements is the crossing of a certain threshold of violence. The 1996 Amended Protocol II, for example, explains that it does not apply to "internal disturbances and tensions, such as riots, isolated and sporadic acts of violence and other acts of a similar nature," because these are not "armed conflicts." 1996 Protocol II, art. 1(2), *id*.[31] Where there is some coordinated or organized campaign of violent acts that crosses that thresh-old, however, the factual situation warrants the application of the laws of armed conflict.

The standards of common Article 3, moreover, are reflective of a minimal standard of conduct that some view as required in all armed conflicts. *Cf.* Hilaire McCoubrey, *International Humanitarian Law: The Regulation of Armed Conflicts* 22 (1990) ("McCoubrey") ("[I]t must be borne in mind that much of Conventional international humanitarian law forms a part of customary law . . . ."). The United

---

[29] We assume for purposes of this discussion that it has not been established that the terrorist network carrying out the attacks was acting effectively as an agent for another nation. If the terrorists were acting as agents for another state, or were sponsored and supported by a state, there could be no question that the attacks constituted an international conflict to which the laws of armed conflict apply.

[30] Common Article 3 extends only certain *prohibitions* under international law to covered internal conflicts. It does not extend prisoner of war status or immunity from domestic prosecution to rebels. *See* 3 *U.S. Practice* at 3448 ("Common Article 3 did not grant rebels the benefits of prisoner-of-war status and thus immunity from prosecution for combatant acts.") (collecting authorities); *id.* at 3464 ("Article III does not provide any immunity from prosecution to individuals for engaging in combatant acts.").

[31] This language is identical to that contained in the 1977 Protocol II to the Geneva Conventions. *See* Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts art. 1(2), June 8, 1977, 1125 U.N.T.S. 609, 611. The United States has signed Protocol II, but is not a party to it. President Reagan forwarded the Protocol to the Senate for advice and consent to ratification on January 29, 1987, but it has not been ratified. *See* 3 *U.S. Practice* at 3428-34.

States recognized that some such minimal principles could be enforced against enemies as long ago as 1945 when the International Military Tribunal at Nuremberg applied standards of the Geneva and Hague Conventions to German conduct on the Eastern Front even though the Soviet Union had expressly denounced the Geneva Conventions before the war. *See id*. at 22-23.[32] Since then, the United States has supported statements in the United Nations of minimal standards, reflective of the principles in common Article 3, that must be observed "by all governmental and other authorities responsible for action in armed conflict." G.A. Res. 2444 (XXIII), ¶ 1, U.N. GAOR, 23d Sess., U.N. Doc. A/7433 (1968). This statement acknowledges that the laws of armed conflict can be applied to a broad range of situations involving non-state actors, for it addresses not only the actions of governments, but also "other authorities" responsible for "action in armed conflict." The United States, in supporting this resolution, indicated that it "constituted a reaffirmation of existing international law." U.N. GAOR, 3d Comm., 23d Sess., 1634th mtg. at 2, U.N. Doc. A/C.3/SR 1634 (1968); *see also* Letter for Sen. Edward Kennedy, Chairman of the Subcommittee on Refugees of the Committee on the Judiciary, from J. Fred Buzhardt, General Counsel, Department of Defense (Sept. 22, 1972), *reprinted in* 67 Am. J. Int'l L. 122, 124 (1973) (noting that Hague Conventions of 1907, Geneva Conventions of 1949, and G.A. Res. 2444 reflect existing international law).

A final source worth noting as reflective of some current theories of the scope of the laws of armed conflict is the decision of the International Criminal Tribunal for the Former Yugoslavia. That Tribunal concluded that certain standards of conduct must constrain all forms of armed conflict of whatever nature. The Tribunal was faced with arguments that certain constraints applied solely to international armed conflict and that only the minimal standards of common Article 3 of the Geneva Conventions could apply to "internal" conflicts. While acknowledging that a fuller set of restrictions would apply to inter-state conflicts, the Tribunal concluded that at least some standards (both articulated by common Article 3 and dictated by customary law) would apply to any situation of armed conflict and explained that an "armed conflict" triggering application of these rules "exists whenever there is a resort to armed force between States or protracted armed violence between governmental authorities and organized armed groups or between such groups within a State." *Prosecutor v. Tadic*, 35 I.L.M. at 54. The critical factor was whether hostilities had "exceed[ed] the intensity requirement," *id*. at 55, sufficiently to be considered an "armed conflict." As the decision of the

---

[32] *See also Quirin*, 317 U.S. at 30, 35 (explaining that by permitting trial of offenses against the "law of war," Congress had incorporated by reference the "common law applied by military tribunals" and principles "recognized in practice both here and abroad"); FM 27-10 ch. 1, ¶ 4(b) ("Although some of the law of war has not been incorporated in any treaty or convention to which the United States is a party, this body of unwritten or customary law is firmly established by the custom of nations and well defined by recognized authorities on international law.").

Tribunal suggests, the laws of armed conflict provide some minimal standards for *any* armed conflict, regardless of the particular characteristics of the conflict as one between states, or states and non-state actors. Thus, the Tribunal suggested that certain "[p]rinciples and rules of humanitarian law reflect 'elementary considerations of humanity' widely recognized as the mandatory minimum for conduct in armed conflicts *of any kind*." *Id*. at 70 (emphasis added).

It should be clear from the foregoing that there is sufficient authority in current sources under international law for the President to justify to the international community a decision that it will be the policy of the United States to apply the laws of armed conflict to terrorists in the current situation. The trigger for application of the laws does not depend on a formal concept of "war," or on the political status of those engaged in the hostilities as sovereigns or states, but rather upon the fact of armed hostilities that have reached a certain level of intensity. If the attacks carried out by the terrorists meet the standards of initiating an "armed conflict," therefore, the laws of armed conflict can be invoked. As one commentator summarized, "[f]or the purposes of bringing into operation the rules regulating the conduct of hostilities, it no longer matters whether those hostilities are characterized as war. It is the factual concept of armed conflict rather than the technical concept of war which makes those rules applicable." C. Greenwood, *The Concept of War in Modern International Law*, 36 Int'l & Comp. L.Q. 283, 304 (1987); *see also* McCoubrey at 24 ("[War] has been deliberately abandoned as a definition of the circumstances of application of the *jus in bello* in general and of international humanitarian law in particular.").[33]

In light of this analysis, two mistaken concepts that might be raised as a basis for denying the application of the laws of armed conflict to the terrorist attacks are worth addressing and dismissing here. First, some might point to statements in older texts that "war" is a condition that exists only between states and claim that there can be no war (and hence no application of the laws of war) here. *See, e.g.*, 2 L. Oppenheim, *International Law: A Treatise* § 54, at 202 (H. Lauterpacht ed., 7th ed. 1952) ("War is a contention between two or more States through their armed forces, for the purpose of overpowering each other and imposing such conditions of peace as the victor pleases."); *id*. § 56, at 203 ("To be war, the contention must be *between States*.").

There are several flaws in such an argument. To the extent it relies on the syllogism that, if a conflict is not between states it cannot be "war" and therefore the laws of war cannot apply, the conclusion is contradicted by the terms of the Geneva Conventions and consistent practice since World War II. As outlined

---

[33] Based on rationales similar to those outlined here, multiple commentators have concluded that terrorist acts may properly trigger application of the laws of war. *See, e.g.*, Crona & Richardson, 21 Okla. City U.L. Rev. 349; Bradley Larschan, *Legal Aspects to the Control of Transnational Terrorism: An Overview*, 13 Ohio N.U.L. Rev. 117, 147-48 (1986); *Should the Laws of War Apply to Terrorists?*, 79 Am. Soc'y Int'l L. Proc. 109, 109-11 (1985).

above, it has long been recognized that formal concepts of "war" do not constrain application of the laws of armed conflict and that non-state actors are properly bound by certain minimum standards of international law when they engage in armed hostilities. In addition, the syllogism itself distorts what was meant by the statement that war "must be between States." In making that assertion, authors such as Oppenheim were suggesting only that for a conflict to be *legitimate* warfare it must be between states. It does not follow from that proposition that, if there is a conflict that amounts to warfare and non-state actors are involved, *none* of the restrictions on armed conflict applies at all. To the contrary, as Oppenheim recognized, quite a different conclusion follows—namely, that non-state actors who engage in warfare are engaged in a form of warfare that is *illegitimate*. *See, e.g.*, Oppenheim § 254, at 574. In other words, they do not *escape* the laws of war because they are non-state actors. Instead, they are unlawful belligerents. Finally, the absolutist proposition that rules restraining the conduct of armed conflict apply only to a war between two states was not accepted even by authors such as Oppenheim. The proposition thus would not even accurately reflect the analysis applied in the discussions of the laws of war on which it purports to rely. Oppenheim, for example, fully acknowledged that at least some aspects of the laws of war would properly apply in a conflict between a state and a non-state actor such as an insurgent group in a civil war. *See id*. § 59, at 209-10. Thus, even in older treatments of the subject, there is nothing talismanic about the involvement of states in a conflict for purposes of applying certain fundamental aspects of the laws of war.

A related mistaken idea would be the suggestion that a trans-national attack by a non-state actor is somehow less susceptible to treatment under the law of war than such an attack carried on internally within a given state. It is true that the trans-national aspect of the attacks carried out by a non-state organization presents a somewhat novel situation. Articulations of the laws of armed conflict concerning non-state actors have been most fully developed in the context of internal conflicts in the form of rebellions or civil wars within a particular state. But, as explained above, there is nothing in the logic of the laws of armed conflict that would restrict its application in the case of a trans-border attack by a private armed band.

The critical question for determining whether the laws of armed conflict apply here, therefore, is whether the terrorist attacks were a sufficiently organized and systematic set of violent actions that they crossed a sufficient level of intensity to be considered "armed conflict." There can be no doubt that, whatever the "level of intensity" required to create an armed conflict, the gravity and scale of the violence inflicted on the United States on September 11 crossed that threshold. To use the words of the 1996 Amended Protocol II to the 1980 U.N. Convention on Conventional Weapons, which provides one guidepost for determining when an armed conflict exists, the attacks are not properly likened to mere "riots, isolated and sporadic acts of violence and other acts of a similar nature," which do not

constitute "armed conflict." Rather, as explained above, the terrorists have carried on a sustained campaign against the United States, culminating most recently with a devastating series of coordinated attacks resulting in a massive death toll.

In addition, the United States has determined that it is necessary to respond to the attacks with military force. That decision is significant because one element often cited for determining whether a situation involving a non-state actor rises to the level of an "armed conflict" (for example, for purposes of common Article 3 of the Geneva Conventions) is whether a state responds with its regular military forces. The United States has urged this position. *See* 3 *U.S. Practice* § 2, at 3443; *see also* G.I.A.D. Draper, *The Red Cross Conventions* 15-16 (1958) (under common Article 3, "armed conflict" exists when the government is "obliged to have recourse to its regular military forces"). Here, this criterion is overwhelmingly satisfied. As outlined above, the United States has found it necessary to respond with a massive use of military force. The current operations in Afghanistan and continuing preparations for a sustained campaign easily establish that the situation here involves an armed conflict for purposes of international law.

Finally, as noted above, NATO's decision to invoke Article 5 of the North Atlantic Treaty by deeming the terrorist acts an "armed attack" conclusively demonstrates that standards under international law for identifying an "armed conflict" have been satisfied here.

## IV. Under the Laws of War, the Terrorists Are Unlawful Combatants Subject to Trial and Punishment for Violations of the Laws of War

We stress at the outset that determining that the terrorist attacks can be treated under the rubric of the "laws of war" does *not* mean that terrorists will receive the protections of the Geneva Conventions or the rights that the laws of war accord to lawful combatants. To the contrary, as the U.S. Army Field Manual, *The Law of Land Warfare*, makes clear, persons who do not comply with the conditions prescribed for recognition as lawful combatants (which include wearing a fixed insignia and bearing arms openly) are not entitled to status as prisoners of war and may be punished for hostile acts in violation of the laws of armed conflict.[34] The Supreme Court made the same distinction clear in *Quirin*: "By universal agreement and practice the law of war draws a distinction between . . . those who are

---

[34] FM 27-10, ch. 3, ¶ 80 ("Persons, such as guerillas and partisans, who take up arms and commit hostile acts without having complied with the conditions prescribed by the laws of war for recognition as belligerents . . . are, when captured by the injured party, not entitled to be treated as prisoners of war and may be tried and sentenced to execution or imprisonment."); *id*. ¶ 81 ("Persons who, without having complied with the conditions prescribed by the laws of war for recognition as belligerents . . . commit hostile acts about or behind the lines of the enemy are not to be treated as prisoners of war and may be tried and sentenced to execution or imprisonment."); *id*. ¶ 82 ("Persons in the foregoing categories who have attempted, committed, or conspired to commit hostile or belligerent acts are subject to the extreme penalty of death because of the danger inherent in their conduct.").

lawful and unlawful combatants. . . . Unlawful combatants . . . are subject to trial and punishment by military tribunals for acts which render their belligerency unlawful." 317 U.S. at 30-31.

We indicate here, based on preliminary research, some offenses that might be charged under the laws of war to establish the jurisdiction of military commissions. The list here is representative only and is not intended by any means to be exhaustive.[35]

As noted above, the terrorists involved in the attacks did not meet even the minimal conditions required to be recognized as lawful combatants. It is open to some doubt whether persons acting without authorization of a state could *ever* undertake hostile acts without violating the laws of war. But we need not reach that theory to conclude that the terrorists did not meet even the most basic requirements for complying with the laws of war as lawful combatants. They were not bearing arms openly and wearing fixed insignia. Thus, all of their hostile acts can be treated as violations of the laws of war. It is settled that any violation of the laws of war may be prosecuted as a "war crime." The U.S. Army Field Manual, *The Law of Land Warfare*, provides that "[a]ny person, whether a member of the armed forces or a civilian, who commits an act which constitutes a crime under international law is responsible therefor and liable to punishment." FM 27-10, ch. 8, ¶ 498. "The term 'war crime' is the technical expression for a violation of the law of war by any person or persons, military or civilian. Every violation of the laws of war is a war crime." *Id*. ¶ 499.[36] Specific offenses here could include violations of the rule prohibiting "[u]se of civilian clothing by troops to conceal their military character," *id*. ¶ 504(g),[37] the rule prohibiting "[f]iring on localities which are undefended and without military significance," *id*. ¶ 504(d), and the rule prohibiting deliberate targeting of civilian populations.[38]

---

[35] The substance of the laws of war, and of the offenses defined by the laws of war, can be determined by looking to past American practice, especially the codification of the laws of war compiled by the United States Army in *The Law of Land Warfare*, and to sources of international law defining the laws of war, *see, e.g*., *Quirin*, 317 U.S. at 30 (examining "universal agreement and practice" and sources from Great Britain and Germany, among other countries).

[36] The Manual further states that "[a]s the international law of war is part of the law of the land of the United States, enemy personnel charged with war crimes are tried directly under international law without recourse to the statutes of the United States. However, directives declaratory of international law may be promulgated to assist such tribunals in the performance of their function." *Id*. ¶ 505(e).

[37] One precedent from a trial before a military commission in the Civil War provides a useful parallel to the terrorist attacks. In 1865 some confederate soldiers were tried for "violations of the laws and usages of civilized war" in that they "came on board a United States merchant steamer in the port of Panama 'in the guise of peaceful passengers' with the purpose of capturing the vessel and converting her into a Confederate cruiser." *Quirin*, 317 U.S. at 32 n.10.

[38] *See, e.g*., FM 27-10, ch. 2, ¶ 25 ("[I]t is a generally recognized rule of international law that civilians must not be made the object of attack directed exclusively against them . . . ."); *id*. ¶ 39 ("The attack or bombardment, by whatever means, of towns, villages, dwellings, or buildings which are undefended is prohibited."). It is a commonly recognized principle under the customary laws of war

In addition, individuals can be prosecuted under the laws of armed conflict using standard theories of aiding and abetting and conspiracy. The U.S. Army Field Manual provides that "[c]onspiracy, direct incitement, and attempts to commit, as well as complicity in the commission of, crimes against peace, crimes against humanity, and war crimes are punishable." FM 27-10, ch. 8, ¶ 500. Commanders can also be held responsible for war crimes committed either under their orders or by those under their command.[39]

PATRICK F. PHILBIN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

that civilian populations should not be the deliberate, sole target of attack. Thus, G.A. Res. 2444, supported by the United States, noted that "it is prohibited to launch attacks against the civilian population as such." *Id*. ¶ 1(b); *cf.* Hersch Lauterpacht, *The Problem of the Revision of the Law of War*, 29 Brit. Y.B. Int'l L. 360, 369 (1952) ("[I]t is in [the] prohibition, which is a clear rule of law, of intentional terrorization—or destruction—of the civilian population as an avowed or obvious object of attack that lies the last vestige of the claim that war can be legally regulated at all. Without that irreducible principle of restraint there is no limit to the licence and depravity of force.").

[39] *See, e.g.*, *The Law of Land Warfare*, FM 27-10, ch. 8, ¶ 501 ("In some cases, military commanders may be responsible for war crimes committed by subordinate members of the armed forces, or other persons subject to their control. . . . Such a responsibility arises directly when the acts in question have been committed in pursuance of an order of the commander concerned. The commander is also responsible if he has actual knowledge, or should have knowledge, through reports received by him or through other means, that troops or other persons subject to his control are about to commit or have committed a war crime and he fails to take the necessary and reasonable steps to insure compliance with the laws of war or to punish violators thereof."); *see also Yamashita*, 327 U.S. at 14-18.